IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC WHITAKER,

    *Plaintiff*,

    v.

MARYLAND TRANSIT
ADMINISTRATION, *et al.*,

    *Defendants*.

Civil No. ELH-17-00584

**MEMORANDUM OPINION**

In this employment discrimination case, plaintiff Eric Whitaker has filed suit against a

host of defendants: his employer, the Maryland Transit Administration ("MTA"); Paul Comfort,

individually and in his official capacity as the MTA Administrator;[1] as well as Richard

Simmons, Robert Gilman, Richard Stelmack, Keith Stewart, and Eric Bowser, individually and

in their official capacities as plaintiff's supervisors at the MTA. ECF 1 ("Complaint").[2]

The Complaint contains five counts against all defendants. In Count One, plaintiff

asserts a claim of race discrimination, in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), codified, as amended, at 42 U.S.C. §§ 2000e *et seq.* Count Two asserts claims of

---

[1] Comfort is no longer the Administrator of the MTA. On August 16, 2017, Maryland Governor Larry Hogan named Kevin B. Quinn, Jr. as the Administrator of MTA. *See* MD. DEP'T OF TRANSP., MD. TRANSIT ADMIN. (last visited Jan. 25, 2018), https://mta.maryland.gov/about-mta. Fed. R. Civ. P. 25(d) states, in pertinent part: "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded."

[2] The caption of the Complaint indicates that plaintiff has sued Comfort "individually and in his official capacity." But, in the first paragraph of the Complaint, plaintiff states that he has sued Comfort, Simmons, Gilman, Stelmack, Stewart, and Bowser "in their official capacities." ECF 1, ¶ 1. Then, in paragraphs 8-12, of the Complaint, plaintiff indicates that he has sued Simmons, Gilman, Stelmack, Stewart, and Bowser "individually and in [their] official capacity."

retaliation under Title VII and the Age Discrimination in Employment Act ("ADEA"), codified, as amended, at 29 U.S.C. §§ 621 *et seq.*[3] Count Three alleges hostile work environment, in violation of Title VII, the ADEA, and the Rehabilitation Act of 1973, codified, as amended, at 29 U.S.C. §§ 791 *et seq.* Plaintiff alleges a violation of the "Equal Pay Act" in Count Four, based on his race. Because plaintiff does not provide a statutory citation, it is unclear whether this claim is raised under federal or Maryland law. Count Five asserts a claim under Maryland law for intentional infliction of emotional distress ("IIED").[4] Plaintiff submits many exhibits with his Complaint. *See* ECF 1-1 through ECF 1-20.

Defendants have filed a prediscovery motion to dismiss, or in the alternative, for summary judgment (ECF 21), supported by a memorandum of law (ECF 21-1) (collectively, "Motion") and multiple exhibits. *See* ECF 21-3 through ECF 21-10. Plaintiff opposes the Motion (ECF 22) and has submitted a memorandum of law (ECF 22-1) (collectively, "Opposition") and various exhibits. *See* ECF 22-2 through 22-8. Defendants have replied (ECF 23, "Reply) and have submitted an additional exhibit. *See* ECF 23-1.

The Motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. I shall construe the Motion as one to dismiss under Rule 12(b)(6). For the reasons stated below, I conclude that plaintiff's claims under the ADEA (Counts Two and Three) are barred by sovereign immunity. Under Title VII, the ADEA, and the Rehabilitation Act, plaintiff may not proceed against Comfort, Simmons, Gilman, Stelmack, Stewart, and Bowser in their individual

---

[3] The ADEA pertains to persons 40 years of age or older. Surprisingly, plaintiff does not state his age in his Complaint. ECF 1. However, his date of birth appears on an exhibit submitted with the Complaint. *See* ECF 1-5. It indicates that plaintiff was born in 1959, and thus he was over 40 years of age at the relevant time. *Id.*

[4] In his "Preliminary Statement," Whitaker avers that he "institutes this action" for the "violation of," *inter alia*, "the Civil Rights Act of 1991." ECF 1, ¶ 1. However, that is the only reference in the Complaint to that statute.

capacities (Counts One, Two, Three, and Four). Plaintiff's Title VII claims for race discrimination (Counts One and Four) and hostile work environment (Count Three) are subject to dismissal for failure to exhaust administrative remedies. Moreover, I am satisfied that plaintiff has abandoned his "Equal Pay Act" claim (Count Four). Further, with respect to plaintiff's claim of hostile work environment under the Rehabilitation Act (Count Three) and the claim of IIED (Count Five), plaintiff has failed to state a claim. As to the claim of retaliation under Title VII against the MTA and the individual defendants in their official capacities (Count Two), I shall deny the Motion as to the MTA, Comfort, Simmons, and Bowser, but grant it as to Gilman, Stelmack, and Stewart.

## I.     Factual and Procedural Background[5]

### A.

Plaintiff is African-American. ECF 1, ¶ 78. It appears that he was 57 years of age when he filed suit. *See* ECF 1-5. Whitaker began working for the MTA on April 3, 1989, as a Bus Mechanic. ECF 1, ¶ 22. At some point in 2001, plaintiff became an "'A' Repairman Electro-Mechanic," the position he held when suit was filed. *Id.* ¶¶ 4, 22, 65. Plaintiff does not detail the job duties of an "'A' Repairman Electro-Mechanic." However, he claims that he has "experienced disparate treatment in work distributions, advancement opportunities and training programs" since 1989. ECF 1, ¶ 23.[6]

The MTA is part of the Maryland Department of Transportation. ECF 1, ¶ 20.[7] It

---

[5] As discussed, *infra*, I shall construe the Motion as one to dismiss. In construing a motion to dismiss, the Court assumes the truth of plaintiff's allegations.

[6] The relevance of claims of discrimination dating to 1989 and 2001 is not readily apparent. *See, e.g.*, ECF 1, ¶¶ 23-24.

[7] Before its name was changed in 2001, the Maryland Transit Administration was known as the Mass Transit Administration. *See* Md. Code (2015, 2017 Supp.), § 7-201 of the

employs approximately 3,200 individuals.  *Id.*

When plaintiff filed suit, Comfort served as the Administrator of the MTA, and Simmons, Gilman, Stelmack, Stewart, and Bowser were management employees of the MTA.  *Id.* ¶¶ 7-12. Stelmack appears to have been plaintiff's first supervisor in the MTA's Bus Facilities Maintenance Department, where plaintiff worked as an "'A' Repairman Electro-Mechanic" from an unspecified date in 2001 until October 27, 2014.  *See* ECF 1 ¶¶ 24, 29-30, 65-67.  Simmons appears to have been plaintiff's second supervisor in the Bus Facilities Maintenance Department. ECF 1, ¶¶ 65-67.  He supervised plaintiff on October 27, 2014, when plaintiff was preparing to transfer from the Bus Facilities Maintenance Department to the Metro Facilities Maintenance Department.  *Id.*  Upon transfer, Bowser became plaintiff's supervisor in the Metro Facilities Maintenance Department.  *Id.* ¶ 67.  Gilman managed the Heating, Ventilation, and Air Conditioning ("HVAC") Technicians in the Metro Facilities Maintenance Department.  *Id.* ¶ 32. A "few years" after plaintiff began working under Stelmack in the Bus Facilities Maintenance Department in 2001, plaintiff unsuccessfully applied for an HVAC Technician position supervised by Gilman.  *Id.* ¶¶ 32-37.  Although Stewart is named as a defendant, plaintiff alleges no facts that pertain to him.  *See* ECF 1.

Plaintiff is a member of the Amalgamated Transit Union, Local 1300 ("Union"), which has entered into a collective bargaining agreement ("CBA") with the MTA.  *Id.* ¶ 21.  Among other things, the CBA governs the rate of pay for MTA employees.  *Id.* ¶ 21.  Plaintiff alleges that the MTA has not compensated him "in accordance with the terms of the CBA."  ECF 1, ¶ 54.  He contends that he is a certified welder and that "'A' Repairman Electro-Mechanics" who are "certified welders" are entitled to "skilled trades pay," pursuant to the CBA.  *Id.* ¶¶ 54, 57,

---

Transportation Article.

58, 61.

**B.**

According to plaintiff, in 2001 there were two "'A' Repairman Electro-Mechanic" positions open in the Bus Facilities Maintenance Department, and he "submitted a bid" for the position in September 2001.  *Id.* ¶ 24.  Plaintiff alleges that he was the most senior, qualified MTA applicant, and the CBA requires the MTA to fill vacant positions with the most senior, qualified employee applicant.  *Id.* ¶ 25.  Nevertheless, both positions were filled by Caucasian applicants with less seniority.  *Id.*  At an unspecified date, plaintiff filed a grievance with the Union and was thereafter awarded one of the vacant "'A' Repairman Electro-Mechanic" positions in the Bus Facilities Maintenance Department.  *Id.* ¶ 26.

Stelmack became plaintiff's supervisor in 2001, when plaintiff began working as an A" Repairman Electro-Mechanic in the Bus Facilities Maintenance Department.  *Id.* ¶¶ 24-26, 29.  Stelmack allegedly told plaintiff that he "would assign Plaintiff the nastiest and dirtiest jobs to break his spirit . . . ." *Id.* ¶ 30.

At an unspecified date, a "few years" after plaintiff became an "'A' Repairman Electro-Mechanic" in 2001, Whitaker applied for a vacant HVAC Technician position in the Metro Facilities Maintenance Department.  *Id.* ¶¶ 24, 32.  Gilman was the "Facilities Maintenance manager" at that time.  *Id.* ¶ 32.  Whitaker alleges that Gilman told plaintiff that he "would do everything in his power to keep Plaintiff from getting the HVAC technician position because Mr. Gilman was in the process of training his son (Caucasian) for the position."  *Id.*

The HVAC Technician position required an applicant to pass "a test."  *Id.* ¶ 33.  Although plaintiff took the test, he claims that unnamed MTA supervisors and managers "deliberately and maliciously withheld Plaintiff's test results."  *Id.*  Plaintiff complained to Brian Williams, MTA's

Director of Labor and Employee Relations, that his test results were being withheld ("Williams Complaint"). *Id.* ¶ 34. Then, the "MTA rescinded the HVAC technician vacancy", in retaliation for plaintiff lodging the Williams Complaint. *Id.* ¶ 35. Additionally, plaintiff alleges that, "at the request of Mr. Gilman," and in retaliation for the Williams Complaint, the requirements for the HVAC Technician position were altered to render plaintiff ineligible for that position. *Id.* ¶ 36. He also states that MTA "management made attempts to help Mr. Gilman's son" obtain the "new qualifications." *Id.* ¶ 37.

Plaintiff asserts that, on an unspecified date, MTA management "mark[ed] up his clean personnel record by falsely alleging that Plaintiff disobeyed direct orders." ECF 1, ¶ 39. In particular, plaintiff avers that an unidentified "supervisor" threatened to take plaintiff "out of service" for his refusal to drive an MTA "service vehicle" that "failed to meet the State of Maryland's safety standards." *Id.* ¶ 40. Additionally, plaintiff asserts that, on an unspecified date, an unidentified "supervisor" denied plaintiff's "requested vacation day", in violation of "MTA seniority policy." *Id.* ¶ 41. Moreover, plaintiff alleges that, at an unspecified time, an unnamed "supervisor" required plaintiff to "perform work" that similarly situated Caucasian "'A' Repairman Electro-Mechanics" "were not ordered to perform." *Id.* ¶ 42.

### C.

Whitaker claims that he filed a "racial discrimination complaint" in October 2011 in the MTA Office of Fair Practice ("MTA Complaint"). ECF 1, ¶ 43. Plaintiff does not specify the allegations. According to plaintiff, MTA "management" retaliated against plaintiff for the MTA Complaint by "installing a window in Plaintiff's office." *Id.* ¶ 44. Whitaker does not identify the MTA "management." But, he states that after he "covered the window for privacy," he was required to "remove the cover" by MTA management. *Id.* ¶ 45. In contrast, MTA management

allowed a Caucasian coworker to paint his own window black. *Id.* ¶ 46.

In June 2012, plaintiff filed a Charge of race discrimination with the Maryland Commission on Civil Rights against the MTA ("2012 Charge"). *Id.* ¶ 48; *see also* ECF 1-6 (Pre-Determination Settlement Agreement of January 10, 2013). Plaintiff does not specify the allegations. *See* ECF 1. But, he avers that a hearing was held in January 2013, which "concluded in his favor." *Id.* ¶ 48. Plaintiff states that the "MTA agreed that plaintiff was eligible for welding training." *Id.* ¶ 49; *see also* ECF 1-6, ¶ 4.

Whitaker asserts that, in retaliation for the 2012 Charge, the MTA denied his "2014 vacation schedule" request, but granted the vacation request of a Caucasian coworker with less seniority than plaintiff. ECF 1, ¶ 51. Additionally, plaintiff claims that Simmons "allowed" a Caucasian employee, Jimmy Rogers, to obtain Rogers's preferred vacation schedule, in violation of the CBA. *Id.* ¶ 52. And, plaintiff avers that, on an unspecified date, he filed a "complaint with the Office of Civil Rights" that raised plaintiff's concerns about the denial of his requested vacation time. *Id.* ¶ 53.[8] As a result of that complaint, Rogers was "forced . . . to pick an alternative vacation week." *Id.* ¶ 53.

### D.

As noted, plaintiff became an "'A' Repairman Electro-Mechanic" in 2001. *Id.* ¶¶ 22, 24, 65. Without specifying a particular point in time, plaintiff avers that the MTA submitted a "recommendation" that "certain Caucasian 'A' Repairman Electro-Mechanics" obtain welding training. *Id.* ¶ 38. Plaintiff asserts that African-American "'A' Repairman Electro-Mechanics" were not recommended for such training. *Id.* And, plaintiff claims that the "MTA deliberately left Plaintiff off the list" of employees who were eligible to receive welding training. *Id.* ¶ 49.

---

[8] Plaintiff does not specify whether the "Office of Civil Rights" is part of the MTA, the Union, the EEOC, or an agency within the government of Maryland. *See* ECF 1.

Nevertheless, plaintiff "attended and completed a welding course on November 11, 2013." ECF 1, ¶ 63. According to plaintiff, an "'A' Repairman Electro-Mechanic" who obtains a welding certificate is entitled to "skilled trades pay" at a rate of $28.55 per hour. ECF 1, ¶¶ 61, 63.

Plaintiff claims that, prior to 2011, the MTA granted skilled trades pay to Caucasian "'A' Repairman Electro-Mechanics," but not African-American "'A' Repairman Electro-Mechanics." *Id.* ¶ 58. Further, plaintiff alleges that some of the Caucasian "'A' Repairman Electro-Mechanics" who received skilled trades pay before 2011 did not have welding certificates. *Id.* ¶¶ 58-59.

Whitaker avers that, at an unspecified date, the Union filed a grievance against the MTA based on the MTA's "refusal to pay skilled trades pay to 'A' Repairman Electro-Mechanics who were certified welders." *Id.* ¶ 55. The MTA and the Union reached an agreement in May 2009 that "directly apply [sic] to the Plaintiff." *Id.* Arbitration followed. *Id.* ¶ 56; *see* ECF 1-8 (Arbitration Decision of January 19, 2011). The Arbitration Decision states that "the Grievants . . . who have been working as welders for the MTA" and who were "tested and certified . . . prior to May 2009" are "entitle to Skilled Trades pay." ECF 1-8 at 28-29. But, the Arbitration Decision also states that "whether other welders . . . are entitled to Skilled Trades pay is remanded" to the MTA and the Union. *Id.* at 29.

Plaintiff asserts: "Pursuant to the 2011 arbitration findings, MTA was ordered to compensate Plaintiff with back pay for skilled trades pay and to increase his hourly rate of pay to the skilled pay rate of $28.55" per hour. ECF 1, ¶ 61. But, plaintiff does not appear to have been among the "'A' Repairman Electro-Mechanics" who were subject to the arbitration award of 2011. *See* ECF 1-8 at 28-29. As noted, only "'A' Repairman Electro-Mechanics" who were "working as welders for the MTA" and who were "tested and certified" in welding before May

-8-

2009 were entitled to skilled trades pay.  *Id.*  And, plaintiff did not become a certified welder until 2013.  ECF 1, ¶ 63.

On October 27, 2014, Whitaker voluntarily transferred from the Bus Facilities Maintenance Department to the Metro Facilities Maintenance Department.  *Id.* ¶ 65.  However, plaintiff's job did not change.  *Id.* ¶¶ 65, 70-71.  He remained an "'A' Repairman Electro-Mechanic", but worked in the Metro Facilities Maintenance Department.  *Id.*  Plaintiff alleges that he was the only African-American in the Metro Facilities Maintenance Department when he transferred in October 2014.  *Id.* ¶ 78.

From the time plaintiff became certified as a welder on November 11, 2013, until the time he transferred to the Metro Facilities Maintenance Department on October 27, 2014, he received the skilled trades pay rate of $28.55 per hour.  *Id.* ¶¶ 63, 67.  Upon Whitaker's transfer in October 2014, Simmons, Whitaker's manager in the Bus Facilities Maintenance Department, completed an administrative document called an "AS-1," dated October 27, 2014.  *See* ECF 1, ¶ 66; ECF 1-14, ("Initial AS-1 Form").  It stated, *inter alia*, that plaintiff's job title in the Bus Facilities Maintenance Department and the Metro Facilities Maintenance Department was "'A' Repairman Electro-Mechanic."  ECF 1-14.  Additionally, it stated that plaintiff's rate of pay in both departments was $27.63.

Plaintiff alleges that the Initial AS-1 Form "inaccurately reported" the hourly rate of pay earned by plaintiff in the Bus Facilities Maintenance Department, at the "unskilled rate" of $27.63 per hour, rather than the skilled trades rate of $28.55 per hour.  ECF 1, ¶ 66; *see also* ECF 1-14.  In other words, plaintiff asserts that when Simmons completed the Initial AS-1 Form, Simmons should have reported plaintiff's rate of pay as $28.55 per hour, rather than $27.63 per hour.  ECF 1, ¶ 66.

Bowser, plaintiff's supervisor upon his transfer to the Metro Facilities Maintenance Department on October 27, 2014, altered the Initial AS-1 Form on November 25, 2014. *Id.* ¶¶ 68-72; ECF 1-16 ("Revised AS-1 Form"). The Revised AS-1 Form changed the Initial AS-1 Form as follows: (1) plaintiff's job title while at the Bus Facilities Maintenance Department was changed from "A Repairman Electro-Mechanic" (ECF 1-14) to "A Repairman-Welder-Skld" (ECF 1-16); and (2) the rate of pay plaintiff earned in the Bus Facilities Maintenance Department as an "A Repairman-Welder-Skld" was changed from $27.63 (ECF 1-14) to $28.55. ECF 1-16. But, Bowser made no alterations to plaintiff's rate of pay or job title in the Metro Facilities Maintenance Department (ECF 1-16), where plaintiff earned $27.63 per hour. *Id.* In effect, the Revised AS-1 Form indicates that plaintiff had previously earned $28.55 in the Bus Facilities Maintenance Department but only $27.63 when he transferred to the Metro Facilities Maintenance Department. *Id.*

Whitaker maintains that Bowser deprived plaintiff of skilled trades pay in the Metro Facilities Maintenance Department. *Id.* ¶ 72. Specifically, plaintiff contends that the Revised AS-1 Form makes it "appear as if he departed from a skilled position ('A' Repairman Welder-Skilled) to an unskilled position ('A' Repairman electro-Mechanic) [sic].'" *Id.* ¶ 69. And, Bowser allegedly made this alteration "in an attempt to strip" plaintiff "of his skilled trades pay by making it appear as if [plaintiff] had transferred into a lower paying job." *Id.* ¶ 68. Therefore, Whitaker's rate of pay in the Metro Facilities Maintenance Department was at the unskilled rate of $27.63 per hour, not the skilled rate of $28.55 per hour, which he had previously earned in the Bus Facilities Maintenance Department. *See Id.* ¶¶ 68-72; ECF 1-16.

According to plaintiff, he was the only "'A' Repairman Electro-Mechanic" in the Metro Facilities Maintenance Department who was eligible for skilled trades pay because he was the

only one with a welding certificate, yet he was the only one who did not receive skilled trades pay at the time of his transfer. ECF 1, ¶ 78. He claims that Caucasian "'A' Repairman Electro-Mechanics" in the Metro Facilities Maintenance Department who were not certified welders "had been receiving skilled trades pay prior to the Plaintiff's transfer[.]" *Id.* ¶ 75. Further, he states that the "MTA never required certification from Caucasian 'A' Repairman Electro-Mechanics" before plaintiff transferred to the Metro Facilities Maintenance Department on October 27, 2014. *Id.* ¶ 79.

Plaintiff filed "a grievance for his skilled trades pay" on an unspecified date. *Id.* ¶ 76. Although plaintiff does not specify where the grievance was filed, it appears that the grievance was filed with the Union on December 10, 2014. ECF 1-17 ("2014 Union Grievance"). Plaintiff claimed that the MTA was wrongly depriving him of skilled trades pay. *Id.* ¶¶ 72-73; *see also* ECF 1-17; ECF 1-18 ("Grievance Decision").

In the Grievance Decision, dated February 5, 2015, Keith Jenkins, MTA Manager of Administration, found that Whitaker qualified as an "A-Repairman with welding skills" and was therefore entitled to back pay for the period of time that he worked in the Metro Facilities Maintenance Department without skilled trades pay, beginning October 27, 2014. *Id.* But, Jenkins also found that the "MTA may elect not to have certified welders in the Metro Facilities Maintenance department . . . ." *Id.* And, Jenkins found that if the MTA made such an election, Whitaker "would no longer be considered for skilled pay." *Id.*

Additionally, plaintiff alleges that after he filed the 2014 Union Grievance, the MTA withdrew skilled trades pay from plaintiff's Caucasian coworkers in the Metro Facilities Maintenance Department. *Id.* ¶ 76. This was done "in an attempt to cover up [MTA's] wrongful payments" to those coworkers (*id.*) and "to mask [MTA's] racial discrimination against"

plaintiff.  *Id.* ¶ 77.

In "March 2015", Whitaker received a check for back pay, at the skilled trades rate, for the hours he worked between "the date of his welding certification through the date of the check."  *Id.* ¶ 74; *see* ECF 1-13 (check dated March 13, 2015, from MTA to Whitaker, in the amount of $317.61).  But, Whitaker states that the MTA did not thereafter compensate him at the skilled trades rate of $28.55 per hour.  ECF 1, ¶ 74.  Further, plaintiff alleges that "as late as November 2016," the hourly pay rate of his Caucasian coworkers was adjusted to reflect the skilled trades pay rate.  *Id.* ¶ 80.  However, as of the date Whitaker filed suit, he alleges that he continued to receive the unskilled pay rate of $27.63 per hour.  *Id.*

As a result of "constant and continuous harassment, retaliation and malicious behavior . . . by MTA management," plaintiff claims that he "has suffered from anxiety-related illnesses." ECF 1, ¶ 47.  Plaintiff does not specify when his anxiety-related illnesses commenced or the duration of the afflictions.  *See* ECF 1; ECF 1-5 (medical evaluation).  A medical evaluation dated March 4, 2015, included as an exhibit to the suit, indicates that plaintiff did not disclose his anxiety related illnesses to the MTA.  *See* ECF 1-5 at 2.

**E.**

On January 19, 2016, plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights[9] against the MTA.  ECF 1-1 ("2016 Charge"); *see also* ECF 1, ¶ 17. In the 2016 Charge, plaintiff alleged that the MTA decreased his pay from $28.55 an hour to $27.63 an hour in retaliation for a "race and retaliation discrimination charge" that plaintiff filed

---

[9] The Commission was previously known as the Maryland Commission on Human Relations.  During the 2011 legislative session, the Maryland General Assembly approved a change in the name; it is now known as the Commission on Civil Rights.  *See* 2011 Md. Laws, Chap. 580; *see also Bd. of Directors of Cameron Grove Condo., II v. State Comm'n on Human Relations*, 431 Md. 61, 64 n.3, 63 A.3d 1064, 1066 n.3 (2013).

"[a]round April 2012." Presumably, the charge plaintiff filed "[a]round April 2012" (ECF 1-1) is the June 2012 Charge, described *supra*. *See also* ECF 1, ¶ 48.

On November 30, 2016, the Equal Employment Opportunity Commission ("EEOC") issued a Dismissal and Notice of Rights to plaintiff. ECF 1-4; *see also* ECF 1, ¶ 19. This suit followed on February 28, 2017. ECF 1.

Additional facts are included in the Discussion.

## II. Standard of Review

### A.

As noted, defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 21. A motion styled in the alternative, to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But when, as here, the movant expressly captions its motion "in the alternative," as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; and the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C ALAN WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed.) (hereinafter, "WRIGHT & MILLER"). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448-49; *see Putney v. Likin*, 656 F. App'x 632, 638-640 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (hereinafter, "*McCray*"). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (hereinafter, "*Harrods*") (quoting *Evans v. Tech's. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, [he] cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing the affidavit

requirement of former Rule 56(f). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961); *see also Dave & Buster's, Inc.*, 616 F. App'x at 561. But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961). But, the failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary," when the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit'," and if the nonmoving party "was not lax in pursuing discovery." *Harrods*, 302 F.3d at 244-45 (quoting *First Chicago Int'l v. United Exchange Co., LTD*, 836 F.2d 1375, 1380-81 (D.C. Cir. 1988)).

Whitaker did not file an affidavit or declaration under Fed. R. Civ. P. 56(d). But, he argues that he has not had an adequate opportunity for discovery (ECF 22-1 at 4) and that summary judgment before discovery would be premature. *See, e.g.*, ECF 22, ¶ 7; *see also* ECF 22-1 at 4, 23-24, 34. Additionally, plaintiff argues that converting the Motion to one for summary judgment would unfairly prejudice him, given the "evidence that remains outstanding." ECF 22-1 at 4. Further, plaintiff argues that he has "outstanding requests" for an EEOC investigation report, his medical records, and "other evidence which supports allegations contained in Plaintiff's Complaint." *Id.* at 23. In relation to his Title VII retaliation claim, plaintiff argues that "summary judgment without the parties having an opportunity to conduct discovery is inappropriate" because plaintiff "must prove that the alleged "adverse employment action" was in retaliation for plaintiff's "'protected activity.'" ECF 22-1 at 24.

*Harrods*, 302 F.3d 214, is instructive. There, the plaintiff had not filed a Rule 56(d) affidavit. *Id.* But, the plaintiff had "advise[d] the district court that it needed discovery" in its opposition to the summary judgment motion. *Id.* at 245. The plaintiff also argued that discovery was necessary because important evidence was "'uniquely in the possession of the defendants.'" *Id.* (citation omitted). The Fourth Circuit noted that discovery "was just getting under way" when the district court granted summary judgment. *Id.* at 246. The Court reiterated that "the proper course" for a party who "believes that more discovery is necessary for it to demonstrate a genuine issue of material fact" is "to file a Rule 56(f) [now Rule 56(d)] affidavit stating 'that it could not properly oppose a motion for summary judgment without a chance to conduct discovery.'" *Id.* at 244 (quoting *Evans*, 80 F.3d at 961).

The Court underscored that ensuring sufficient time for discovery is "'especially important when the relevant facts are exclusively in the control of the opposing party.'" *Id.* at

246-47 (quoting WRIGHT & MILLER § 2741).  Additionally, the Court found that the plaintiff, in its opposition, identified two questions of material fact that required further development through discovery.  *Id.* at 245-46.  And, the Court emphasized that granting summer judgment before discovery "can be particularly inappropriate when a case involves complex factual questions about intent and motive."  *Id.* at 248 (citations omitted).  Therefore, the Fourth Circuit concluded that the district court had acted prematurely by granting summary judgment before additional discovery.  *Id.* at 247.

The case of *McCray*, 741 F.3d 480, is also informative.  In *McCray*, the Fourth Circuit considered whether the district court erred when it granted summary judgment to the defense before plaintiff had an opportunity to conduct discovery.  *Id.* at 483.

The plaintiff in *McCray* had been an employee of the MTA for more than 40 years before she filed an EEOC Charge alleging discrimination under, *inter alia*, Title VII based on race and gender.  *Id.* at 481-82.  In the district court, the MTA moved to dismiss the suit and the plaintiff moved for more time to conduct discovery, pursuant to Rule 56(d).  *Id* at 482.  The district court denied plaintiff's Rule 56(d) motion, converted the MTA's motion to one for summary judgment, and granted summary judgment for the MTA.  *Id.*  On appeal, the Fourth Circuit reiterated that discovery is appropriate when "the main issue" is "one of motive" and when "most of the key evidence lies in the control" of the party moving for summary judgment.  *Id.* at 484.  The Fourth Circuit determined that the plaintiff's Title VII claims required the plaintiff to show "that she was fired because of discriminatory reasons," and that such evidence was within the control of the MTA.  *Id.*  "Absent discovery," said the Court, the plaintiff lacked "adequate access to this evidence, and therefore no way to shield herself from a premature summary judgment motion."  *Id.*  The Fourth Circuit concluded that summary judgment was premature

under Rule 56(d).  *Id.* at 481, 484.

Accordingly, I conclude that plaintiff is entitled to conduct reasonably discovery.  As the Fourth Circuit stated in *McCray*, 741 F.3d at 483, "[s]ummary judgment before discovery forces the non-moving party into a fencing match without a sword or mask."  A party "needs an 'adequate opportunity' to present its case and 'demonstrate a genuine issue of material fact.'" *Adams Housing, LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 222 (4th Cir. 2016) (quoting *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989)).

Therefore, I decline to convert the Motion to one for summary judgment.  Instead, I shall construe it as a motion to dismiss under Rule 12(b)(6).

## B.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts

sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S.

265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman* ).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'" *U.S. ex rel. Oberg v. Pennsylvania*

*Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC,* 754 F.3d 195, 198 (4th Cir.2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004).

Accordingly, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see also U.S. ex rel. Oberg*, 745 F.3d at 136; *Anand*, 754 F.3d at 198; *Am. Chiropractic Ass'n*, 367 F.3d at 234; *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations

omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *petition for cert. filed*, No. 17-492 (Oct. 3, 2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

As noted, plaintiff submitted multiple exhibits with his Complaint. *See* ECF 1-1 through ECF 1-20. Several of these documents have already been discussed in the Factual and Procedural Background of this Memorandum Opinion. *See* ECF 1-5 (sealed medical evaluation); ECF 1-6 (Pre-Determination Settlement Agreement of January 10, 2013); ECF 1-8 (Arbitration Decision of January 19, 2011); ECF 1-13 (check dated March 13, 2015); ECF 1-14 (Initial AS-1 Form); ECF 1-16 (Revised AS-1 Form); ECF 1-17 (2014 Union Grievance); ECF 1-18 (Grievance Decision, dated February 5, 2015). Plaintiff has adopted the contents of these exhibits as true and has incorporated them into his Complaint to support his claims. *See, e.g.*, ECF 1, ¶¶ 47, 50, 56, 65, 68, 72-74. Accordingly, the exhibits submitted with the Complaint (ECF 1-5; ECF 1-6; ECF 1-8; ECF 1-13; ECF 1-14; ECF 1-16; ECF 1-17; ECF 1-18) may be considered by the Court without converting the Motion to one for summary judgment.

Additionally, defendants attached eight exhibits to the Motion. *See* ECF 21-3 (First Affidavit of Brian Williams, MTA Director of Labor Relations, signed on April 3, 2017); ECF 21-4 (Copy of an Agreement between the MTA and the Union); ECF 21-5 (spreadsheet consisting of the names and racial demographics of several MTA employees); ECF 21-6 (Union Grievance of Leroy Carpenter, Shop Steward, dated March 2015); ECF 21-7 (Hearing Decision, dated April 2016, denying the Grievance of Carpenter); ECF 21-8 (AS-1 Form of Shawn Davis,

an MTA Employee); ECF 21-9 (AS-1 Form of Daniel Hoff, an MTA Employee); ECF 21-10

(AS-1 Form of Glenn Metzler, an MTA Employee).  Plaintiff does not dispute the authenticity of

the exhibits submitted with the Motion.  *See* ECF 22.  However, these exhibits were not

incorporated in the Complaint.  *See* ECF 1.  Nor do they "give[] rise to the legal rights asserted"

by plaintiff in his Complaint.  *See Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 611.

Accordingly, I find that the exhibits submitted with the Motion (ECF 21-3 through ECF 21-10)

are not integral to the Complaint.  Therefore, I shall not consider them.

Further, plaintiff attached multiple exhibits to his Opposition.  *See* ECF 22-2 (Metro

Facilities Maintenance Department Seniority List); ECF 22-3 (excerpt from an unidentified

document concerning wage rates for several MTA employees); ECF 22-4 (affidavits of Richard

Spann and Kenneth Hawkins, former MTA employees; and affidavits of Jerry Beatty, Atiba

McIntosh, Edward Wood, Patrick Merrick, Kenneth Duckett, and Julius Dowe, current MTA

employees); ECF 22-5 (Freedom of Information Act request submitted by plaintiff's counsel to

the EEOC in February 2017); ECF 22-6 (memorandum from plaintiff's counsel to Dr. Elvira

Pasmanik, dated March 2017, requesting plaintiff's medical records); ECF 22-7 (Bus Facilities

Maintenance Department "Vacation Pick 2013" form); ECF 22-8 (Union Grievance filed by Ed

Williams in October 1989; and a letter from Eugene Woodward, "B" Repairman Bush Division,

dated February 1995).  These exhibits were not incorporated in the Complaint.  *See* ECF 1.  Nor

do the documents give rise to the claims made by plaintiff in his Complaint.  Accordingly, I

conclude that the exhibits submitted with plaintiff's Opposition are not integral to his Complaint,

and I shall not consider them.

Moreover, defendants submitted an exhibit to the Reply.  *See* ECF 23-1 (second Affidavit

of Brian Williams, MTA Director of Labor Relations, signed on April 27, 2017).  Because this

exhibit was not incorporated in the Complaint and does not give rise to plaintiff's claims, it is not integral to the Complaint. Accordingly, I shall not consider it.

### III.   Discussion

### A.  Individual Capacity

Plaintiff filed suit against Comfort, Simmons, Gilman, Stelmack, Stewart, and Bowser in their individual capacities, under Title VII, the ADEA, and the Rehabilitation Act. ECF 1. In the Motion, defendants urge the Court to dismiss the suit against the defendants in their individual capacities, arguing that they are not individually "amenable to suit under federal employment discrimination statutes." ECF 21-1 at 18. In his Opposition, plaintiff argues that the Maryland Local Government Tort Claim Act ("LGTCA"), Md. Code (2013, 2017 Supp.), §§ 5-301 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."), confers authority to sue the defendants in their individual capacities. *See* ECF 22-1 at 32-33.

As defendants contend, a supervisor cannot be held liable in his individual capacity as the "employer" under Title VII, the ADEA, or the Rehabilitation Act. *See Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (concluding that Title VII and the ADEA do not allow actions against employees in their individual capacities); *McNeal v. Montgomery Cty., Md.*, 307 F. App'x 766, 775 n.6 (4th Cir. 2009) ("[O]nly an employer, not an individual employee, may be held liable under the ADEA" and "Title VII."); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999) (citing *Hiler v. Brown*, 177 F.3d 542, 545-47 (6th Cir. 1999)) ("[B]ecause it incorporates the remedies available under Title VII, the Rehabilitation Act does not permit actions against persons in their individual capacities."); *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 180 (4th Cir. 1998) ("[S]upervisors are not liable in their individual capacities for Title VII violations."); *Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir. 1994)

(concluding that a supervisor may not be held liable under the ADEA in his individual capacity).

In the context of Title VII, an "'employer'" is "'a person engaged in an industry affecting commerce who has fifteen or more employees.'" *Baird ex rel. Baird*, 192 F.3d at 472 (quoting 42 U.S.C. § 2000e(b)). And, the Fourth Circuit has "expressly held that Title VII does not provide a remedy against individual defendants who do not qualify as 'employers'" in their own right. *Baird ex rel. Baird*, 192 F.3d at 472. The same generally applies to an ADEA claim lodged against a defendant in his individual capacity. *See Birkbeck*, 30 F.3d at 510 (citing 29 U.S.C. § 630(b), which defines "employer" in the context of the ADEA as "a person engaged in an industry affecting commerce who has twenty or more employees[.]"); *see also Meadows v. Charles Cty. Sch. Bd. Of Educ.*, DKC-16-2897, 2017 WL 2618272, at * 6 n.8 (D. Md. June 16, 2017) ("Title VII and the ADA 'do not provide for causes of action against defendants in their individual capacities.'") (citation omitted); *Tibbs v. Balt. City Police Dep't*, RDB-11-1335, 2012 WL 3655564, *6 (D. Md. Aug. 23, 2012) ("[S]upervisors cannot be held individually liable under Title VII.").

The Fourth Circuit does not appear to have squarely addressed whether a defendant, in his individual capacity, may be held liable under the Rehabilitation Act. However, the weight of authority among courts in the Fourth Circuit indicates that the Rehabilitation Act does not provide for suit against a defendant in his individual capacity. *See Rendelman v. Rouse*, 569 F.3d 182, 188-89 (4th Cir. 2009) (concluding, after referring to the Rehabilitation Act as "a spending clause statute", that "it would be a novel use of the spending clause to condition the receipt of federal funds on the creation of an *individual capacity* damages action") (emphasis in original); *Baird ex rel. Baird*, 192 F.3d at 472 (stating that "the Rehabilitation Act does not permit actions against persons in their individual capacities"); *see also Keith-Foust v. N.C. Cent.*

*Univ.* 15-cv-470, 2016 WL 4256952, at *13 (M.D.N.C. Aug. 11, 2016) (concluding that the "Rehabilitation Act" does "not provide a cause[] of action against individual defendants in their individual capacities"); *Nolan v. Hamidullah*, 7-1141-JFA, 2009 WL 2982746, at *5 (D.S.C. Sept. 10. 2009) ("Individual Defendants cannot be liable under the Rehabilitation Act in their individual capacities."); *Swaim v. Westchester Acad., Inc.*, 170 F. Supp. 2d 580, 583 (M.D.N.C. 2001) ("Even if the Rehabilitation Act did apply, however, individual supervisors cannot be held personally liable for retaliation."); *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 420 (E.D. Va. 1999) (concluding, as a matter of law, that plaintiff cannot state a claim against the defendant in his individual capacity under the Rehabilitation Act).

Plaintiff's reliance on the LGTCA is misplaced. The LGTCA generally applies to "claims seeking redress for government violations of the state constitution where unliquidated damages are sought." *Rounds v. Md.-Nat'l Capital Park & Planning Comm'n*, 441 Md. 621, 641-42, 109 A.3d 639, 651 (2015). With the enactment of the LGTCA, the Maryland General Assembly sought to "'provide a remedy for those injured by local government officers and employees[.]'" *Faulk v. Ewing*, 371 Md. 284, 298, 808 A.2d 1262, 1272 (2002) (quoting *Moore v. Norouzi*, 371 Md. 154, 165, 807 A.2d 632, 639 (2002)). The LGTCA also sought to ensure "that the financial burden of compensation is carried by the local government ultimately responsible for the responsible public officials' acts." *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 465 (1995).

The LGTCA provides, in relevant part, C.J. § 5-304:

> (b)(1) Except as provided in subsections (a) and (d) of this section, an action for unliquidated damages may not be brought against a local government or

its employees unless the notice of the claim required by this section is given within 1 year after the injury.[10]

(2) The notice shall be in writing and shall state the time, place, and cause of the injury.

Section 5-304(d) governs when there is a failure to provide the requisite notice:

(d) Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given.

Notably, during the 2016 legislative session, the General Assembly added subsection (e). *See* 2016 Md. Laws, ch. 624; *see Coleman*, 2017 WL 2180635, at *7 n.9.  It provides, C.J. § 5-304(e):

(e) This section does not apply if, within 1 year after the injury, the defendant local government has actual or constructive notice of:

(1) The claimant's injury; or

(2) The defect or circumstances giving rise to the claimant's injury.

"'It is a longstanding principle of Maryland jurisprudence that the LGTCA notice provision is a condition precedent to maintaining an action directly against a local government or its employees.'"  *Rounds*, 441 Md. at 642, 109 A.3d at 651 (quoting *Hansen v. City of Laurel*, 420 Md. 670, 682, 25 A.3d 122, 130 (2011)).  The "purpose of the notice requirement is 'to apprise a local government of its possible liability at a time when it could conduct its own investigation, *i.e.*, while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.'"  *Rounds*, 441 Md. at 642-43, 109 A.3d at 651 (quoting

---

[10] During the 2015 legislative session, the Maryland General Assembly extended the time for a plaintiff to provide notice, from 180 days to one year.  *See* 2015 Md. Laws Ch. 131; *see also Coleman v. Mayor & City Council of Balt.*, 2017 WL 2180635, at *7 n.9 (Md. Ct. Spec. App. May 18, 2017) (unreported).

*Prince George's Cty. v. Longtin*, 419 Md. 450, 466, 19 A.3d 859, 869 (2011)) (additional citation omitted).

Defendants have not raised the issue of notice under the LGTCA. In any event, C.J. § 5-301(d) defines local government to include twenty-eight different entities and organizations, including, *inter alia*, the Garrett County and Carroll County public transportation authorities. *See* C.J. § 5-301(d)(1)-(28). And, C.J. § 5-302(b)(2)(i) states that an employee of a local government "shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice." Notably, the MTA is not among the twenty-eight entities and organizations defined as a local government by the LGTCA. *See* C.J. § 5-301(d)(1)-(28). Indeed, plaintiff acknowledges that the MTA is a State agency. ECF 1, ¶ 20; *see also* Transportation Article § 7-201 *et seq.* (establishing the MTA as a State agency). Therefore, the LGTCA does not authorize plaintiff to sue MTA employees in their individual capacities.

Accordingly, plaintiff's claims under Title VII, the ADEA, and the Rehabilitation Act against Comfort, Simmons, Gilman, Stelmack, Stewart, and Bowser, in their individual capacities, are subject to dismissal.

### B. The ADEA—Sovereign Immunity

As noted, Whitaker lodges a claim of retaliation in Count Two, based on the ADEA. And, in Count Three, he alleges a claim of hostile work environment under the ADEA. ECF 1, ¶¶ 92, 97.

The ADEA "'broadly prohibits arbitrary discrimination in the workplace based on age.'" *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120 (1985) (quoting *Lorillard v. Pons*, 434 U.S. 575, 577 (1978)); *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 357 (1995). It protects individuals 40 years of age or older. *See* 29 U.S.C. § 631(a); *Bodkin v. Town*

*of Strasburg, Va.*, 386 F. App'x 411, 413-14 (4th Cir. 2010) (per curiam). The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . or . . . to reduce the wage rate of any employee in order to comply with this chapter." 29 U.S.C. §§ 623(a)(1), 623(a)(3); *see also Hartman v. Univ. of Md. at Balt.*, 595 F. App'x 179, 181 (4th Cir. 2014) (per curiam); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).

To plead adequately a claim of employment discrimination under the ADEA, a plaintiff typically must allege: "(1) he is a member of a protected class—that is, 40 years or older;[11] (2) he suffered an adverse employment action; (3) he was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or he was replaced by a substantially younger person." *Bodkin*, 386 F. App'x at 413-14 (citations omitted) (alterations in *Bodkin*); *see also* 29 U.S.C. § 623(a). A plaintiff bringing a disparate treatment claim under the ADEA "must prove that age was not merely a motivating factor of the challenged adverse employment action but was in fact its 'but-for' cause." *Hartman*, 595 F. App'x at 181 (citing *Univ. of Tex. SW Med. Ctr. V. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 2523 (2013), and *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

In the Motion, defendants argue that the MTA and its agents are protected from suit under federal law based on Eleventh Amendment sovereign immunity, which has not been abrogated as to ADEA claims. *Id.* (citing *McCray*, 741 F.3d at 483). In his Opposition,

---

[11] As noted, plaintiff does not state his age in the Complaint. Arguably, plaintiff's failure to allege in his Complaint that he is 40 years of age or older would be grounds for dismissal of the ADEA claim, for failure to state a claim.

Whitaker contends that the Maryland Tort Claims Act ("MTCA") permits plaintiff to lodge ADEA claims against the MTA, notwithstanding sovereign immunity. ECF 22-1 at 28-31. Notably, plaintiff has not filed suit under the MTCA.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. CONST. amend XI. The Eleventh Amendment "embodies the principle of sovereign immunity and prohibits suit by private parties against states in federal courts." *Weller v. Dep't of Soc. Serv's for City of Balt.*, 901 F.2d 387, 397 (4th Cir. 1990).

The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002); *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). Thus, states enjoy immunity from suits brought in federal court by their own citizens, even though the text of the Eleventh Amendment does not explicitly address such a scenario. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Tr.'s of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court.").

Under the Eleventh Amendment, an individual is barred from bringing suit against a state in federal court to recover damages, unless an exception to sovereign immunity applies. *See Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011);

*see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) (quoting *Hans*, 134 U.S. at

15) ("For over a century we have reaffirmed that federal jurisdiction over suits against

unconsenting States 'was not contemplated by the Constitution when establishing the judicial

power of the United States.'") (internal quotation marks and citation omitted); *Edelman v.

Jordan*, 415 U.S. 651, 663 (1974) ("[A]n unconsenting State is immune from suits brought in

federal courts by her own citizens as well as by citizens of another State.").

And, of import here, Eleventh Amendment sovereign immunity also bars suit against an

instrumentality of a state, sometimes referred to as an "arm of the state," absent waiver or a valid

congressional abrogation of sovereign immunity. In *Pennhurst State Sch. & Hosp. v.

Halderman*, 465 U.S. 89, 101-02 (1984), the Court said: "It is clear, of course, that in the absence

of consent a suit in which the State or one of its agencies or departments is named as the

defendant is proscribed by the Eleventh Amendment." *See also Regents of Univ. of Cal. v. Doe*,

519 U.S. 425, 429 (1997); *McCray*, *supra*, 741 F.3d at 483; *Bland v. Roberts*, 730 F.3d 368, 389

(4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479

(4th Cir. 2005).

As indicated, plaintiff relies on the MTCA, the relevant portion of which is codified at

Md. Code (2014, 2017 Supp.), § 12-104 of the State Government Article ("S.G."). It provides a

limited waiver of Maryland's sovereign immunity in "a court of the State." S.G. § 12-104(a).

The MTCA has no bearing here. The Fourth Circuit stated in *Weller*, 901 F.2d at 397-98:

> The waiver of sovereign immunity in the Maryland Torts Claims Act clearly
> limits the state's waiver of immunity to actions brought in the Maryland state
> courts. *Smith v. Bernier*, 701 F. Supp. 1171 (D. Md. 1988); Md. St. Gov't. Code
> Ann. § 12-104 (1984). A state's waiver of immunity from suit in state court "is
> not enough to waive the immunity guaranteed by the Eleventh Amendment."
> *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S. Ct. 3142, 3147, 87
> L.Ed.2d 171 (1985) (citations omitted).

Thus, defendants correctly argue that the MTA and its agents, in their official capacity, are immune from suit under the ADEA. *See* ECF 21-1 at 16; ECF 23 at 9-10. Maryland has not waived its immunity in federal court to claims filed under the ADEA, and the ADEA does not abrogate Eleventh Amendment sovereign immunity. *See McCray*, 741 F.3d at 483 (citing *Garrett*, 531 U.S. at 363-64); and *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 (2000)). And, Eleventh Amendment sovereign immunity extends to Maryland's agencies and their agents in their official capacity. *See id.*; *see also Constantine*, 411 F.3d at 479.

To be sure, under *Ex parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment does not bar a suit against a State agent acting in his official capacity when a plaintiff seeks prospective injunctive relief. *See also Constantine*, 411 F.3d at 476. However, Whitaker does not seek prospective injunctive relief. *See* ECF 1 at 20-21. Rather, he seeks monetary relief. *Id.*

Accordingly, Whitaker's ADEA claims of retaliation (Count Two) and hostile work environment (Count Three), lodged against the MTA and its employees in their official capacity, are barred by Eleventh Amendment sovereign immunity. And, as discussed, plaintiff cannot pursue his ADEA claim against the individual defendants in their personal capacities.

Even assuming, *arguendo*, that the ADEA claims were not barred by sovereign immunity, a plaintiff must file a charge with the EEOC before filing suit under the ADEA in a federal court. 29 U.S.C. § 626(d)(1); *see Calvert Grp.*, 551 F.3d at 300; *see also Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Jones v. Southpeak Interactive Corp. of De.*, 777 F.3d 658, 670 (4th Cir. 2015). Plaintiff's 2016 EEOC Charge (ECF 1-1) does not raise a claim of age-based discrimination. Accordingly, Whitaker has not exhausted his ADEA claims.

### C. Title VII

#### 1. Generally

Relying on Title VII, plaintiff asserts claims against all defendants for race discrimination (Count One); retaliation (Count Two); and hostile work environment (Count Three). *See* ECF 1, ¶¶ 85-103.

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Young v. United Parcel Service, Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *DeMasters v. Carilion Clinic, et al.*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). It also prohibits an employer from retaliating against an employee because the employee filed a grievance or complaint regarding an employment practice that allegedly violated Title VII's antidiscrimination provision. *See* 42 U.S.C. § 2000e-3(a); 796 F.3d at 415.

#### 2. Administrative Exhaustion

Under Title VII, a plaintiff must file a charge of discrimination with the EEOC, or a comparable state agency, before filing suit in a federal court. 42 U.S.C. § 2000e–5(f)(1); *see Calvert Grp.*, 551 F.3d at 300.[12] This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) ("We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them.").

---

[12] The exhaustion requirement also applies to the ADEA. *See* 29 U.S.C. § 626(d); *see also Calvert Grp.*, 551 F.3d at 300.

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012).

An aggrieved person must file a Title VII complaint with the EEOC within 180 days of the alleged discrimination, except in a "deferral" jurisdiction, where the period is 300 days. *See* 42 U.S.C. § 2000e-5(e)(1); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002). Maryland is a deferral state. And, the Maryland Commission on Civil Rights is the applicable State enforcement agency. *See, e.g.*, *Dewitt v. Clean Harbors Envtl. Servs., Inc.*, RDB-16-1705, 2017 WL 3116609, at *3 (D. Md. July 21, 2017).

The exhaustion requirement of Title VII functions as a jurisdictional bar in federal court, when a plaintiff has failed to comply with it. In *Balas*, 711 F.3d at 406, the Fourth Circuit said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies." An aggrieved party who fails to comply with the applicable administrative procedures has failed to exhaust his administrative remedies and is generally barred from filing suit. *See, e.g.*, *Balas*, 711 F.3d at 407; *Miles*, 429 F.3d at 491; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Failure to comply generally mandates dismissal of a suit. *Lorenzo v. Rumsfeld*, 456 F. Supp. 2d 731, 734 (E.D. Va.

2006) (citing *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 970 (4th Cir. 1985)).

Even when a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look *only* to the charge filed with that agency." *Balas*, 711 F.3d at 408 (emphasis added); *see also Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation."); *Evans v. Tech.'s Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."). Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality," courts are "not at liberty to read into administrative charges allegations they do not contain." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Id.* at 407-08 (citations omitted).

However, "[t]he touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' not precisely the same . . . ." *Sydnor*, 681 F.3d at 595. The Court explained in *Sydnor*, 681 F.3d at 594: "[A]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit." *See accord Southpeak Interactive Corp. of Del.*, 777 F.3d at 669; *see Calvert Grp., Ltd.*, 551 F.3d at 300; *Evans*, 80 F.3d at 963.

The Fourth Circuit's opinion in *Jones v. Calvert Grp.*, 551 F.3d 297, provides guidance.

In that case, the plaintiff filed a charge with the Maryland Commission on Human Relations, checking only the box for "retaliation." *Id.* She stated: "'I believe I am being forced to work in a hostile environment and subjected to differential treatment in retaliation for filing' [a prior] charge." *Id.*; *see id.* at 301. Plaintiff subsequently brought suit, alleging retaliation as well as race and sex discrimination, in violation of Title VII. *Id.* at 299. She also alleged age discrimination, in violation of the ADEA. *Id.* The defendant moved to dismiss under Rule 12(b)(6). *Id.* After converting the motion to dismiss to a motion for summary judgment, the district judge entered judgment in favor of the defendant, on the merits. *Id.* at 299-301.

The Fourth Circuit concluded that the plaintiff had failed to exhaust administrative remedies. *Id.* at 299. It reasoned, *id.* at 301: "The . . . charge alleged that [plaintiff] was being retaliated against because she had filed [a previous] charge; it did not allege that she was discriminated against based on her age, sex, or race. Indeed, she checked only the 'retaliation' box on her EEOC charge and left unchecked the boxes for 'age,' 'sex,' or 'race.'"

*Belyakov v. Medical Science & Computing*, 86 F. Supp. 3d 430, 440 (D. Md. 2015), is also instructive. In *Belyakov*, the plaintiff applied for a job with the National Institutes of Health through the defendant staffing firm. *Id.* at 432. When plaintiff did not get the job, he filed suit against the defendant, alleging age discrimination under the ADEA, as well as national origin discrimination and retaliation under Title VII. In granting summary judgment in favor of the staffing agency as to the national origin claim, the district judge said: "Belyakov did not check the box for national origin discrimination in his EEOC charge, nor did he claim national origin discrimination or allege any facts relating to his national origin . . . in the narrative portion of his EEOC charge." *Id.* at 440. Instead, the plaintiff "asserted only claims for, and alleged facts relating to, age discrimination in violation of the ADEA and retaliation in violation of Title VII

. . . ." *Id.* Therefore, the court determined that the plaintiff failed to exhaust his national origin claim. *Id.*; *see also Byington v. NBRS Fin. Bank*, 903 F. Supp. 2d 342, 350 (D. Md. 2012) (finding that the plaintiff failed to exhaust her administrative remedies as to discrimination on the basis of age because she "did not check the box for discrimination based on age, and there is no reference to age discrimination in the narrative portion of the document"); *Talbot v. Foodservice, Inc.*, 191 F. Supp. 2d 637, 640 (D. Md. 2002) (same, for disability discrimination).

### a. Plaintiff's 2016 Charge

Plaintiff submitted a copy of his 2016 Charge as an exhibit to his Complaint. ECF 1-1. The Charge, dated January 19, 2016, lacks plaintiff's signature in the portion of the Charge affirming, under penalty of perjury, that plaintiff's allegations are true and correct. *Id.* Under 42 U.S.C. § 2000e-5(b), "Charges shall be in writing under oath or affirmation . . . ." And, 29 C.F.R. § 1601.9 requires: "A charge shall be in writing and signed and shall be verified." The 2016 Charge is unsigned and unverified. *See* ECF 1-1. But, defendants do not challenge the Charge on this basis.

Additionally, in answer to the query "DISCIMINATION BASED ON," plaintiff only checked the box for retaliation. ECF 1-1 (capitals in original). He did not check the boxes for race, sex, age, or disability discrimination. *Id.* And, in the area of the EEOC Charge dedicated to the "PARTICULARS" of his claim, plaintiff stated, *id.* (capitals in original):

I.   I began my employment with the above named Respondent [MTA] on April 3, 1989 as an "A" Repairman Diesel mechanic and later became an "A" Repairman Electro-Mechanic. Around April 2012, I filed a race and retaliation discrimination charge against the Respondent (531-2012-01201). In December 2013, my pay was decreased from $28.55 an hour to $27.63 an hour. Since then, I stopped receiving pay altogether with the exception of a single payment on March 13, 2015. I was the only employee subject to this adverse treatment.

II.  I was not given a reason for the difference in treatment.

III.      I believe my pay was decreased and eventually stopped in retaliation for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

Although plaintiff averred in the 2016 Charge that his pay was decreased in "December 2013," plaintiff stated in the portion of the Charge for the "DATE(S) DISCRIMINATION TOOK PLACE" that the "[e]arliest" date discrimination occurred was December 1, 2014, and that the "[l]atest" date discrimination took place was December 1, 2015. *Id.* (capitals in original). Whitaker presumably referred to the 2012 race and retaliation discrimination charge to show that he had engaged in protected activity, which led to his retaliation claim. *Id.* Further, plaintiff alleged that his "pay was decreased and eventually stopped in retaliation for engaging in a protected activity in violation of Title VII . . . ." ECF 1-1.

### b. Race Discrimination Under Title VII

Plaintiff alleges that defendants' "conduct, as alleged at length" in the Complaint, "constitutes discrimination based on race in violation of Title VII." ECF 1, ¶ 86. However, defendants argue in the Motion that plaintiff's 2016 Charge did not contain an allegation of discrimination based on race. ECF 21-1 at 12-13.

Plaintiff counters, *inter alia*, that failing to check the box for race discrimination on the 2016 Charge was a "mere technical defect or omission," and that "courts construing Title VII have been extremely reluctant to allow procedural technicalities to bar claims brought under" Title VII. *Id.* at 6 (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970)).[13]

---

[13] The plaintiff in *Sanchez* filed an initial EEOC charge of discrimination that alleged only sex discrimination. *Id.* at 458. She later filed an amended charge of discrimination that added a claim of discrimination based on national origin. *Id.* at 458-59. The Fifth Circuit determined that the amended EEOC charge related back. *Id.* at 462-64. In this lawsuit, Whitaker did not file an amended EEOC charge adding a claim of discrimination. Accordingly, *Sanchez* is inapposite.

Moreover, plaintiff contends that his Charge "'must be' construed with utmost liberality'" because he completed the Charge without the assistance of counsel. *Id.* (quoting *Alvarado v. Bd. Of Tr.'s Of Montgomery Comm. Coll.*, 848 F.2d 457 (4th Cir. 1988)).

Further, plaintiff argues that the 2016 Charge included allegations of "adverse treatment" and "different treatment" that give rise to an inference of race discrimination. ECF 22-1 at 5. However, the adverse treatment alleged by plaintiff in the 2016 Charge pertains to the decrease in his pay "in retaliation for engaging in protected activity." *Id.*

Plaintiff's reliance on *Alvarado*, 848 F.2d 457, is misplaced. The plaintiff in *Alvarado* initially filed an EEOC charge of discrimination that named "Montgomery Community College" as the respondent. *Id.* at 459. However, in the civil suit later filed in federal court, the plaintiff named as defendants the "Board of Trustees of Montgomery Community College and the president of the college." *Id.* The Fourth Circuit determined that the change from "Montgomery Community College" to the "Board of Trustees of Montgomery Community College" did not justify dismissal of plaintiff's claim based on a failure to exhaust administrative remedies. *Id.* at 460. Specifically, the Court characterized as "hypertechnical" the error of naming Montgomery Community College instead of its Board of Trustees. *Id.* at 460. And, the Court determined that the plaintiff's initial charge put the defendants on notice of the claims against them. *Id.*

This case does not involve a misnomer or a semantic mistake. Plaintiff's civil suit alleges claims under Title VII that are not found in the Charge. *See* ECF 1; ECF 1-1. But, the Court is unable to read a race discrimination claim into the 2016 Charge. *See Balas*, 711 F.3d at 408. Therefore, plaintiff has failed to exhaust his administrative remedies for the Title VII claim of race discrimination.

### c. Hostile Work Environment Under Title VII

Plaintiff asserts a claim of hostile work environment under Title VII. *See* ECF 1. Specifically, plaintiff avers that he was "subjected to constant harassment by [MTA] supervisors," and that the supervisors' conduct "was motivated by the fact that the plaintiff is African-American." *Id.* ¶¶ 98, 100. In the Motion, defendants argue that plaintiff's claim of hostile and abusive work environment should be "dismissed as beyond the scope of the administrative charge . . . ." ECF 21-1 at 13.

In his Opposition, plaintiff does not address the issue of administrative exhaustion in relation to his Title VII claim of hostile work environment. *See* ECF 22-1 at 4-7. Rather, he merely elaborates on facts that were asserted in his Complaint. *See id.* at 26-28.

In the 2016 Charge, plaintiff checked the box indicating that he claimed retaliation, but he failed to assert a claim of hostile work environment under Title VII. ECF 1-1. To be sure, there is no designated box for a claim of hostile work environment. But, there is a box that states: "OTHER (*Specify*)." *Id.* (capitals in original). It was left blank by plaintiff. *Id.* In the Charge, plaintiff alleged that around "April 2012" he "filed a race and retaliation discrimination charge", that his "pay was decreased" in "December 2013" in "retaliation for engaging in a protected activity", and that his rate of pay has not increased since that date. *Id.* However, and of import here, plaintiff failed to allege any facts consistent with a claim of a hostile work environment. *Id.*

The Fourth Circuit has stated that a "hostile environment exists" under Title VII when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *Harris v. Forklift Sys.*,

*Inc.*, 510 U.S. 17, 21 (1993)).  The 2016 Charge put defendants on notice of a Title VII claim of retaliation, but did not describe a workplace fraught with intimidation, ridicule, or insult. Plaintiff did not administratively exhaust a Title VII claim of hostile work environment.

### d.  Retaliation Under Title VII

As indicated, on the 2016 Charge, plaintiff checked only the box claiming retaliation. ECF 1-1.  He stated that his pay was reduced in "December 2013", in "retaliation" for a prior "race and retaliation discrimination charge" that he filed against the MTA in 2012.  *Id.*  Plaintiff also asserted that the MTA retaliated against him from December 1, 2014, through December 1, 2015.  *Id.*  Plaintiff did not check the box on the Charge for a "continuing action" of retaliation. *Id.*  However, he stated that, "with the exception of a single payment on March 13, 2015", plaintiff "stopped receiving [skilled trades] pay altogether."  *Id.*

In a deferral State, such as Maryland, a complainant must file an EEOC charge of discrimination within 300 days of the alleged discrimination.  *See* 42 U.S.C. § 2000e-5(e)(1); *see also Dewitt*, 2017 WL 3116609, at *3.  Because plaintiff alleged that the retaliation continued throughout December 1, 2015, his EEOC Charge was timely filed on January 19, 2016.

Notably, a plaintiff may assert facts arising from events outside "the charge filing period" when making claim of discrimination in compensation under Title VII.  42 U.S.C. § 2000e-5(e)(3)(B).  Section 2000e-5(e)(3)(B) states, in part, *id.* (emphasis added):

> [L]iability may accrue and an aggrieved person may obtain relief . . . including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are *similar or related* to unlawful employment practices with regard to discrimination in compensation that occurred *outside the time for filing a charge*.

*See also* § 1981a; § 2000e-3(a); 2000e-5(e)(3)(A).  This is true of a Title VII retaliation claim.  § 2000e-5(e)(3)(B); § 1981a; § 2000e-3(a); *see also Taylor v. Millennium Corp.*, 15-cv-1046, 2016

WL 927185, at *3 (E.D. Va. Mar. 4, 2016) (quoting *Johnson v. Portfolio Recovery Associates, LLC*, 682 F. Supp. 2d 560, 585 (E.D. Va. 2009)) ("'A plaintiff who has filed a timely EEOC charge for at least one instance of pay discrimination can recover back pay for pay discrimination that occurred in the two years prior to the filing of the EEOC charge, if the discrimination that occurred outside the charge period is 'similar or related to' the unlawful practice in the timely-filed EEOC charge.'").

In his Complaint, plaintiff avers that he filed a Charge with the EEOC in June 2012 (ECF 1, ¶ 48), which resulted in a Pre-Determination Settlement Agreement. *See* ECF 1-6; *see also* ECF 1 ¶ 49. The Complaint also alleges that defendants retaliated against plaintiff for filing the 2012 Charge by decreasing his wages in October 2014, from $28.55 to $27.63 per hour, when plaintiff transferred from the Bus Facilities Maintenance Department to the Metro Facilities Maintenance Department. *See* ECF 1, ¶¶ 65-72, 80. Further, Whitaker alleges that, except for back pay that he received in March 2015 (ECF 1-13), the MTA has not compensated him at the skilled trades pay rate since October 27, 2014. ECF 1 ¶¶ 65, 72, 74.

The allegation in the Complaint that plaintiff's wages were reduced in October 2014 is "similar" and "related" to the allegations in the 2016 Charge. Accordingly, at this juncture, the Court may consider a claim of discriminatory compensation that otherwise accrued "up to two years preceding the filing of the charge", in January 2016. *See* 42 U.S.C. § 2000e-5(e)(3)(B); *see also* §1981a; § 2000e-3(a). This includes facts dating to October 2014 that pertain to the MTA's reduction of plaintiff's wages in retaliation for the 2012 Charge. However, the Charge was not timely filed as to conduct that occurred before March 25, 2015, if the conduct is not similar or related to the claim of a retaliatory reduction in wages.

Many allegations in the suit predate March 25, 2015, and are not related to the timely

retaliation claim of a reduction in pay. These include claims of "disparate treatment in work distributions, advancement opportunities and training programs" that plaintiff avers date to "1989" (ECF 1, ¶ 23); events pertaining to plaintiff becoming an "'A' Repairman Electro-Mechanic" in 2001 (*id.* ¶¶ 24-26, 29-30); the claim of denial of the HVAC Technician position a "few years later" (*id.* ¶¶ 32-37); and alleged retaliation arising from plaintiff's filing of the MTA Complaint in October 2011. *Id.* ¶¶ 43-46.[14]

As noted, the 2016 Charge does not contain allegations as to these claims. Nor are these allegations similar to plaintiff's salary reduction claim. Because these claims fall outside the 300 day filing period, they are not subject to consideration under Title VII.

Therefore, plaintiff has exhausted a Title VII claim of retaliation only as to his claim that the MTA reduced his pay in October 2014 from $28.55 to $27.63 per hour, in retaliation for his filing of an EEOC Charge of Discrimination in 2012.

I turn to consider whether the allegations of retaliation under Title VII are sufficient to survive dismissal under Fed. R. Civ. P. 12(b)(6).

### 3. Proof of Retaliation Under Title VII

#### a.

Title VII prohibits an employer from retaliating against an employee because the employee filed an earlier Charge of Discrimination. *See* 42 U.S.C. § 2000e-3(a); 796 F.3d at 415. In general, there are "two avenues" *at trial* by which a plaintiff may prove a violation of

---

[14] As indicated, plaintiff also alleges that the MTA retaliated against him for filing the 2012 Charge by denying plaintiff's 2014 vacation request. ECF 1, ¶¶ 51-53. However, plaintiff does not state when his request for vacation was denied. In any event, the denial of plaintiff's vacation schedule is not similar or related to his reduction in pay. And, plaintiff's Charge did not allege retaliation on the basis of the denial of his 2014 vacation request. Accordingly, the claim of retaliation arising from the denial of plaintiff's 2014 vacation request is neither timely nor exhausted.

Title VII. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015), as *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act); *Guessous*, 828 F.3d at 216 (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the

plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In a retaliation case, the Fourth Circuit has said that, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "'(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005)); *see also Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 211 (4th Cir. July 7, 2017); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-*

*Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the motion to dismiss stage, these approaches merely serve to inform a court's evaluation of the allegations. *Cf. Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that

the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1162 (2016).

As the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal* and *Twombly*. *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of *Twombly* is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684; *accord Woods*, 855 F.3d at 647.

In *Woods*, 855 F.3d at 648, the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies . . . ." The question at the motion to dismiss stage is whether plaintiff has stated "a plausible claim for relief under Title VII . . . ." *Ciociola v. Balt. City Bd. of Sch. Commissioners*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

Therefore, at a minimum, plaintiff must plead facts that make it plausible that he was

subjected to retaliation as a result of engaging in protected activity. *See id.*

**b.**

"[I]n the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "To fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co*., 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

Notably, "[t]o establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998)); *see also Dowe*, 145 F.3d at 657; *cf. Conrad v. CSX Transp., Inc.*, WMN-13-3730, 2014 WL 7184747, at *4 (D. Md. Dec. 15, 2014), *aff'd*, 824 F.3d 103 (4th Cir. May 25, 2016). Ordinarily, there must also exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).

A "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (quoting *Dowe v. Total Action Against Poverty in*

*Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). Indeed, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (although a period of nine to ten months between the protected conduct and the adverse action presented "a very close question," the trier of fact could find a causal connection where the defendant declined to hire the plaintiff "at the first available opportunity").

In addition, to prevail on a retaliation claim under Title VII, "the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice if they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Harris*, 510 U.S. at 21; *Hoyle*, 650 F.3d at 333-34.

In a retaliation claim, the standard for an adverse employment action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, a plaintiff must show that the challenged action

"well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted).

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. Moreover, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).

**c.**

Plaintiff alleges in his Complaint that he filed an EEOC Charge of Discrimination against the MTA in June 2012. ECF 1, ¶ 48; *see also* ECF 1-6. Filing an EEOC Charge of Discrimination is a protected activity under Title VII. *See Laughlin*, 149 F.3d at 259. Thus, plaintiff has alleged facts sufficient to show that he engaged in a protected activity. Additionally, Whitaker has plausibly alleged that the MTA took an adverse action against him by reducing his rate of pay. As indicated, Whitaker avers in his Complaint that he was paid at the skilled trades pay rate of $28.55 per hour from the time he became a certified welder on November 11, 2013, until he voluntarily transferred to the Metro Facilities Maintenance Department on October 27, 2014. ECF 1, ¶¶ 63, 65, 67, 70-71.

As noted, Simmons, plaintiff's supervisor in the Bus Facilities Maintenance Department, completed and signed the Initial AS-1 Form on October 27, 2014. *Id.* ¶ 66; ECF 1-14. Whitaker alleges that the Initial AS-1 Form incorrectly reported plaintiff's rate of pay in the Bus Facilities Maintenance Department as $27.63 per hour. ECF 1, ¶ 66; *see also* ECF 1-14. After the transfer, Bowser, plaintiff's supervisor in the Metro Facilities Maintenance Department, revised and signed the AS-1 Form on November 25, 2014. ECF 1, ¶¶ 68-72; ECF 1-16.

The Revised AS-1 Form (ECF 1-16) stated that Whitaker earned $28.55 per hour as an "A Repairman-Welder-Skld" in the Bus Facilities Maintenance Department, before plaintiff transferred to the Metro Facilities Maintenance Department. It also stated that, after the transfer, plaintiff became an "A Repairman Electro-Mechanic," without skilled trades pay. *Id.* According to plaintiff, Bowser purposely revised the AS-1 Form to make it appear that Whitaker had transferred from a skilled trades position to an unskilled position. ECF 1, ¶¶ 68-69. Plaintiff alleges that Bowser made these revisions to "strip" plaintiff of skilled trades pay. *Id.* Whitaker also alleges that after he transferred to the Metro Facilities Maintenance Department, he was the only "'A' Repairman Electro-Mechanic" in that department who was not paid at the skilled trades pay rate. *Id.* ¶ 78. Yet, plaintiff claims that he was the only "'A' Repairman Electro-Mechanic" who was certified as a welder, and therefore he was the only "'A' Repairman Electro-Mechanic" in that department who was eligible for skilled trades pay. *Id.* ¶¶ 75, 78.

Reducing an employee's pay may well dissuade a "reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. at 68. Accordingly, Whitaker has also plausibly alleged an adverse action for the purpose of his Title VII retaliation claim. As explained below, Whitaker has also plausibly alleged that his decrease in pay was due to his prior filing of the 2012 Charge. According to the Complaint, the EEOC Charge filed by plaintiff in June 2012 resulted in a Pre-Determination Settlement Agreement dated January 10, 2013. *See* ECF 1-6. As a condition of the settlement, the MTA agreed that Whitaker was eligible for "welding training when it is offered" by the MTA. *Id.* ¶ 4; *see also* ECF 1, ¶ 49.

In his Complaint, plaintiff avers that he became certified as a welder on November 11, 2013. ECF 1, ¶ 63. And, plaintiff states that the welding certificate entitled him to the skilled

trades pay rate of $28.55 per hour. *Id.* ¶ 63. According to plaintiff, he was paid at the skilled trades rate from November 2013 until Simmons and Bowser completed and revised the AS-1 Form in October and November 2014, respectively. *Id.* ¶¶ 63, 66-72; *see also* ECF 1-14; ECF 1-16. In other words, approximately 28 months elapsed between the June 2012 Charge and the date plaintiff's pay was decreased in October 2014. And, approximately 21 months elapsed between the Pre-Determination Settlement Agreement in January 2013 and the pay decrease in October 2014.

As stated, the causation element of a Title VII claim of retaliation ordinarily requires "some degree of temporal proximity." *Constantine*, 411 F.3d at 501. And, a lengthy time lapse often diminishes the inference of causation. *Constantine*, 411 F.3d at 501 (citation omitted). However, Whitaker need not establish a prima facie case of retaliation at this juncture. *See Woods*, 855 F.3d at 648. Rather, he must plead facts that make it plausible that he was subjected to retaliation in 2014 as a result of his protected activity in 2012. *See id.*; *see also Ciociola*, 2016 WL 125597, at *4. For the purposes of Rule 12(b)(6), plaintiff has met this burden.

Plaintiff stopped earning skilled trades pay in October 2014 when Simmons reported on the Initial AS-1 Form that plaintiff had not received skilled trades pay in the Bus Facilities Maintenance Department. ECF 1, ¶ 66; *see* ECF 1-14. Although Bowser revised the AS-1 Form to show that plaintiff had earned skilled trades pay in the Bus Facilities Maintenance Department, Bowser did not award plaintiff skilled trades pay in the Metro Facilities Maintenance Department. ECF 1, ¶¶ 68-72; *see* ECF 1-16. Yet, plaintiff alleges that all the other "'A' Repairman Electro-Mechanics" in the Metro Facilities Maintenance Department were receiving skilled trades pay when plaintiff transferred into that department. ECF 1, ¶¶ 75, 78-79. According to plaintiff, he was the only "'A' Repairman Electro-Mechanic" who was not

receiving skilled trades pay in the Metro Facilities Maintenance Department. *Id.* And, plaintiff's coworkers were not certified as welders, yet plaintiff was certified as a welder. *Id.*

Defendants argue in the Motion that plaintiff's claims amount to "no more than contractual disputes regarding interpretation of the collective bargaining agreement between" the MTA and the Union. ECF 22-1 at 1. Indeed, as indicated, plaintiff has averred many facts pertaining to his alleged rights under the CBA. However, courts do not generally "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (4th Cir. 1999).

Assuming the truth of the facts alleged by plaintiff, as I must, plaintiff has adequately alleged that Simmons and Bowser retaliated against him, based on the filing of the June 2012 Charge, by stripping plaintiff of skilled trades pay in October 2014. Accordingly, I shall deny the Motion as to plaintiff's Title VII claim of retaliation (Count Two) with respect to the MTA, as well as Comfort, Simmons, and Bowser in their official capacities. However, plaintiff has alleged no facts of retaliation as to Gilman, Stelmack, or Stewart. Therefore, Count Two is subject to dismissal as to those defendants, in their official capacities, with leave to amend.

### D. Intentional Infliction of Emotional Distress

Plaintiff alleges a claim of IIED against all defendants. ECF 1, ¶¶ 107-109. Specifically, he claims that the defendants' "conduct was extreme and outrageous"; that they "acted intentionally and recklessly"; and that their "conduct was the direct cause of the Plaintiff's severe emotional distress." *Id.*

In the Motion, defendants argue that Whitaker's IIED claim fails because plaintiff has alleged no facts showing that defendants engaged in "outrageous" behavior. *See* ECF 21-1 at 19. Specifically, they contend that the "ordinary administrative employment" matters plaintiff

alleges in his Complaint do not surpass "all possible bounds of decency . . . in a civilized community." *Id.* And, defendants argue that the claim is barred by Maryland's three-year statute of limitations. *See id.* In his Opposition, plaintiff does not address limitations. *See* ECF 22-1.

Maryland's Statute of Limitations, Md. Code (2013, 2017 Supp.), § 5-101 of the C.J. Article, states: "A civil action at law shall be filed within three years from the date it accrues . . . ." Because plaintiff filed this lawsuit on February 28, 2017, an IIED claim that accrued before February 28, 2014, is barred by C.J. § 5-101.

As noted, plaintiff's reduction in pay occurred at the time of his transfer in October 2014. *See* ECF 1, ¶¶ 63, 66-72, 74-80; ECF 1-14; ECF 1-16. And, plaintiff claims that he suffered anxiety-related illnesses (ECF 1, ¶ 47), without referencing a date. But, he was initially seen by Dr. Ahluwalia on January 8, 2015, and was evaluated in March 2015. ECF 1-5 at 1. To the extent that plaintiff's IIED claim arises from the pay decrease in October 2014 and the anxiety related illnesses he reported in January 2015, the claim is timely raised under C.J. § 5-101.

Nevertheless, a claim for intentional infliction of emotional distress is disfavored in Maryland, difficult to establish, and is "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011). In order to prevail on a claim for IIED in Maryland, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there is a causal connection between the defendant's wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); *accord, e.g.*, *Manikhi v. MTA*, 360 Md. 333, 758 A.2d 95, 112, 113 (2000); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

Notably, the "extreme and outrageous" standard is quite high. *See generally Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of intentional infliction of emotional distress is "rigorous, and difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham v. Mayor & City Council of Baltimore*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

Even assuming that plaintiff has alleged facts sufficient to show defendants' conduct was so extreme as to exceed "all possible bounds of decency," *Arsham*, 85 F. Supp. 3d at 850, plaintiff has alleged no facts indicating that he suffered from severe emotional distress. At most, plaintiff baldly asserts that he suffers from anxiety and other similar maladies. *See* ECF 1, ¶ 47; *see also* ECF 1-5 at 1-2.

Plaintiff's afflictions do not rise to the level of a "*severely* disabling emotional response," as is required to state a claim of IIED. *See Manikhi*, 360 Md. at 370, 758 A.2d at 115 (quoting *Harris*, 281 Md. at 570, 380 A.2d at 616) (emphasis in *Manikhi*). Indeed, a plaintiff's "anxiety over career prospects" does "not rise to the level of severe emotional distress." *See Manikhi*, 360 Md. at 3769, 758 A.2d at 114-15 (citing *Hanna v. Emergency Med. Assocs.*, 77 Md. App. 595, 609, 551 A.2d 492, 499 (1989)).

Moreover, plaintiff has not alleged facts showing that his anxiety was caused by defendants' wrongful conduct. Indeed, the sealed medical evaluation submitted as an exhibit to the Complaint (ECF 1-5) describes plaintiff's anxiety as "longstanding", and indicates that plaintiff began experiencing anxiety approximately twenty years before defendants' alleged wrongful conduct occurred. *See id.* at 2. Additionally, the medical evaluation is careful to note that its contents are based on plaintiff's self-reporting. *Id.* at 1. Further, the evaluation does not provide a diagnosis for Whitaker, and it indicates that plaintiff has not been formally diagnosed. *Id.* at 2.

For the forgoing reasons, plaintiff has failed to allege a claim of IIED. Accordingly, Count Five of the Complaint is subject to dismissal.

### E. Hostile Work Environment Under The Rehabilitation Act

In Count Three, plaintiff lodges a claim of hostile work environment under the Rehabilitation Act. *See* ECF 1, ¶ 97. Section 504(a) of the Rehabilitation Act, codified, as amended, at 29 U.S.C. § 794(a), provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."[15]

---

[15] The parties do not address the issue of whether plaintiff exhausted his Rehabilitation Act claim. On the 2016 EEOC Charge, plaintiff did not check the box for discrimination based on disability. *See* ECF 1-1.

Whitaker is not a federal employee. The weight of authority suggests that he need not exhaust his Rehabilitation Act claim. *See Harris v. O'Malley*, WDQ-13-2579, 2015 WL 996557, at *5 (D. Md. Mar. 4, 2015) ("'[C]ourts have uniformly held that non-federal employees need not exhaust administrative remedies before bringing a private action under Section 504'" of the Rehabilitation Act) (citation omitted); *see also Raiford v. Md. Dep't of Juvenile Serv's*, DKC-12-3795, 2014 WL 4269076, at *7 n.7 (D. Md. Aug. 28, 2014) (stating that, in the context of a Section 504 claim brought by a non-federal employee, the "Rehabilitation Act—unlike the

To establish a claim of hostile work environment under the Rehabilitation Act, a plaintiff must demonstrate that he "is a qualified individual with a disability." *Edmonson v. Potter*, 118 F. App'x 726, 730 (4th Cir. 2004) (per curiam). A plaintiff must also demonstrate that the alleged conduct of the employer: (1) was unwelcome; (2) resulted because of his disability; (3) was "'sufficiently severe or pervasive' to alter the conditions" of his employment; and (4) was "imputable to [his] employer." *Pueschel v. Peters*, 577 F.3d 558, 565-66 (4th Cir. 2009) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 338 (4th Cir. 2003)) (en banc).

Of import, the Fourth Circuit has said:

> While the first element is subjective, the rest of the test is made up of objective components based on a "reasonable person" standard. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). This Court has held that in order to prove the second element, a plaintiff must show that "'but for' the employee's sex [disability, or protected activity], he or she would not have been the victim of the discrimination." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 723 (4th Cir. 2007) (quoting *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d

---

ADA—has no administrative exhaustion requirement"); *Bowman-Cook v. Wash. Metro. Area Transit Auth.*, DKC-14-1877, 2017 WL 3592450, at *5 n.4 (D. Md. Aug. 21, 2017) (citing *Harris*, 2015 WL 996557, at *5) ("Non-federal employees are not required to exhaust any administrative remedies under the Rehabilitation Act . . . ."). *See generally Lucas v. Henrico Cty. Sch. Bd.*, 822 F. Supp. 2d 589, 603-04 (E.D. Va. 2011) ("[N]on-federal employees need not exhaust administrative remedies before bringing a private action under Section 504 of the Rehabilitation Act.") (citing, *inter alia, Freed v. Consol. Rail Corp.*, 201 F.3d 188, 193 (3d Cir. 2000), *Brennan v. King*, 139 F.3d 258, 268 n.12 (1st Cir. 1998), *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 470-71 (6th Cir. 1993), *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990), *Miener v. Missouri*, 673 F.2d 969, 978 (8th Cir. 1982), *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1381-82 (10th Cir. 1981), and *Lloyd v. Reg'l Transp. Auth.*, 548 F.2d 1277, 1287 (7th Cir. 1977)).

In contrast, federal employees must administratively exhaust a Rehabilitation Act claim before lodging a complaint under that statute. *Wilkinson v. Rumsfeld*, 100 F. App'x 155, 157 (4th Cir. 2004) ("Rehabilitation Act claims against the federal government must comply with the same administrative procedures that govern federal employee Title VII claims.") (citing *Doe v. Garrett*, 903 F.2d 1455, 1460-61 (11th Cir. 1990)) (stating that a Rehabilitation Act claim brought by a federal employee under 29 U.S.C. § 791 is modeled on Title VII and must be exhausted, but a claim under 29 U.S.C. § 794, which is modeled on Title VI, need not be exhausted).

138, 142 (4th Cir. 1996)). As for the third element, harassment is considered sufficiently severe or pervasive to alter the terms or conditions of the employment if a workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21, 114 S. Ct. 367 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (internal quotation marks omitted)).

*Pueschel*, 577 F.3d at 565; *see also Edmonson*, 118 F. App'x at 730.

Whitaker claims that defendants violated the Rehabilitation Act by creating a hostile work environment. ECF 1, ¶¶ 96-103. He alleges, *inter alia*, that plaintiff was "subjected to constant harassment by supervisors" that was "so severe and pervasive that a reasonable person . . . would find his work environment to be hostile" and that the conduct "was not welcomed by the Plaintiff." *Id.* ¶¶ 98-101. Further, plaintiff asserts that the "constant and continuous harassment, retaliation and malicious behavior" of his supervisors at MTA caused him to suffer from "anxiety-related illnesses." *Id.* ¶ 47; *see also* ECF 1-5. As indicated, he alleges "unequal treatment in "work distributions, advancement opportunities and training programs", dating from 1989 through 2014. *See, e.g.*, ECF 1, ¶¶ 23-26, 29-30, 32-37, 43-46, 51-53.[16] Plaintiff submitted a medical evaluation dated March 4, 2015, to support his claim. *See* ECF 1-5.

---

[16] Unlike Title VII, the Rehabilitation Act does not specify a limitations period. Because of this, courts "borrow" the most appropriate or analogous state statute of limitations and apply it to claims lodged under the Rehabilitation Act. *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). "'Maryland courts apply the three-year limitations period governing general civil actions to [ ] Rehabilitation Act claims.'" *Bowman-Cook*, 2017 WL 3592450, at *5 (alteration in *Bowman-Cook*) (quoting *Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 226 (4th Cir. 2013)); *see also Schalk v. Associated Anesthesiology Practice*, 316 F. Supp. 2d 244, 251 (D. Md. 2004).

However, defendants did not raise the issue of the timeliness of plaintiff's Rehabilitation Act claim. And, the Court may not raise the issue *sua sponte*. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653-54 (4th Cir. 2006); *see also id.* at 657 (concluding that the "district court should have refrained from raising and considering the statute of limitations defense *sua sponte*."); *see also Goyal v. Thermage, Inc.*, WDQ-08-0020, 2010 WL 2651185, at *2 (D. Md. July 1, 2010) ("Generally, a defendant waives the statute of limitations by failing to raise that defense in its answer or a pre-answer motion.").

Defendants argue that plaintiff has failed to state a claim under the Rehabilitation Act because, *inter alia*, he has not alleged facts that he was discriminated against because of a "real or perceived" disability. ECF 21-1 at 16-17.

Apart from his anxiety-related illnesses, plaintiff alleges no facts to suggest he suffers from a disability. *See* ECF 1; *see also* ECF 22 at 1, ¶ 3. But, even if plaintiff's "anxiety-related illnesses" (ECF 1, ¶ 47) qualify as a disability under the Rehabilitation Act, plaintiff has failed to allege facts that show his supervisors were aware of his anxiety-related illnesses, or that plaintiff's supervisors discriminated against him because of his disability. *See* ECF 1. Indeed, the medical evaluation filed by plaintiff (ECF 1-5) indicates that he concealed his anxiety from his supervisors. *See* ECF 1-5 at 2. Accordingly, Whitaker has not alleged that his supervisors knew about plaintiff's anxiety-related illnesses or discriminated against him because of those maladies. *See Pueschel*, 577 F.3d at 565 (citation omitted).

Construing the allegations in the Complaint as true, plaintiff has not alleged facts sufficient to state a claim of hostile work environment under the Rehabilitation Act. Accordingly, the Rehabilitation Act claim (Count Three) is subject to dismissal.

### F. "Equal Pay Act"

In Count Four, plaintiff avers that defendants violated the "Equal Pay Act," but plaintiff does not include a citation to a federal or Maryland statute. *See* ECF 1 at 20. Plaintiff asserts only that he "received lower pay for equal work" performed, "simply because he is African-American." *Id.* ¶ 105.

The federal Equal Pay Act of 1963 is part of the Fair Labor Standards Act of 1938, codified, as amended, at 29 U.S.C. § 206(d). The Equal Pay Act provides, in part: "No employer having employees subject to any provisions of this section shall discriminate, within any

establishment in which such employees are employed, between employees *on the basis of sex* by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees *of the opposite sex* in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ." § 206(d)(1) (emphasis added).

Maryland's analogue to the Equal Pay Act is the Maryland Equal Pay for Equal Work law, Md. Code (2016, 2017 Supp.), §§ 3-303 through 3-309 of the Labor & Employment Article ("L.E."). In relevant part, L.E. § 3-304(b)(1)(i) states: "An employer may not discriminate between employees in any occupation by paying a wage to employees of *one sex or gender identity* at a rate less than the rate paid to employees of *another sex or gender identity* if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type . . . ." (Emphasis added).

In the Motion, defendants argue that "the federal and Maryland Equal Pay Acts . . . apply solely to gender pay discrimination," not race discrimination. Additionally, defendants argue that plaintiff has made no "allegations in his Charge of discrimination that would support a Title VII claim based on Mr. Whitaker's allegations in Count Four that he received lower pay based on his race." ECF 21-1 at 17-18.

In his Opposition, plaintiff states that the reference to the "Equal Pay Act" in his Complaint was "inaccurate." ECF 22-1 at 31-32. And, plaintiff avers that he no longer seeks to advance a claim under the "Equal Pay Act." *Id.* Although plaintiff concedes that his reference to the "Equal Pay Act" in the Complaint was "inaccurate," he contends that Count Four alleges a claim of "unequal pay based on race," pursuant to the Lilly Ledbetter Fair Pay Act of 2009, codified at 42 U.S.C. § 2000e-5(e)(3)(A), (B). *See* ECF 22-1 at 31-32. And, Whitaker avers in

his Opposition that "Count Four does not fail" simply because it names the "Equal Pay Act" instead of the Lilly Ledbetter Fair Pay Act. ECF 22-1 at 32; *see also* ECF 1 at 20.[17]

The Lilly Ledbetter Fair Pay Act of 2009 amended Title VII. *See* Lilly Ledbetter Fair Pay Act of 2009, § 3(A), § 3(B), codified at 42 U.S.C. §§ 2000e-5(e)(3)(A), (B).[18] Under 42 U.S.C. § 2000e-5(e)(3)(A), each paycheck that arises from a discriminatory compensation practice is regarded as a separate violation of Title VII. And, discrimination based on race may form the basis of a claim under §§ 2000e-5(e)(3)(A), (B). *See* § 1981a. Moreover, a claimant "may obtain relief . . . where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge." § 2000e-5(e)(3)(B).

Plaintiff's proposed claim under the Lilly Ledbetter Fair Pay Act alleges that he received lower pay based on his race: African-American. *See* ECF 22-1 at 31-32; *see also* ECF 1 at 20, ¶ 105. However, as discussed earlier, plaintiff has failed to exhaust a Title VII claim of discrimination based on race. *See* ECF 1-1.

## IV. Conclusion

For the reasons set forth above, I shall dismiss plaintiff's ADEA claims in Counts Two and Three; the Title VII claim of race discrimination in Counts One and Four; the Title VII claim of hostile work environment in Count Three; the Rehabilitation Act claim of hostile work environment in Count Three; and the IIED claim in Count Five. Additionally, plaintiff has

---

[17] Without providing a complete citation, the Opposition relies on "*Rice v. Green Tree Servicing, LLC,* 2015" to argue that misnaming the cause of action in Count Four of the Complaint is not grounds for dismissal. ECF 22-1 at 32. *See Rice v. Green Tree Servicing*, *LLC*, 14-cv-93 (GROH), 2015 WL 1478595 (N.D.W. Va. Mar. 31, 2015).

[18] The statute overturned the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, *Inc.*, 550 U.S. 618 (2007).

abandoned his "Equal Pay Act" claim initially alleged in Count Four of the Complaint. Further, I find that plaintiff may not proceed under Title VII, the ADEA, or the Rehabilitation Act against Comfort, Simmons, Gilman, Stelmack, Stewart, and Bowser in their individual capacities (Counts One, Two, Three, and Four). Construing the Motion as a motion to dismiss, I shall deny the Motion as to plaintiff's Title VII claim of retaliation against the MTA, Comfort, Simmons, and Bowser, in their official capacities, and grant it as to the Title VII claim of retaliation against Gilman, Stelmack, and Stewart, in their official capacities (Count Two).

      An Order follows.

Date: February 14, 2018                           _____/s/_____
                                                Ellen Lipton Hollander
                                                United States District Judge