IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC WHITAKER,

    Plaintiff,

vs.

MARYLAND TRANSIT
ADMINISTRATION, ET AL.,

    Defendants.

Civil Action No. ADC-17-0584

## MEMORANDUM OPINION

Defendants, Maryland Transit Administration, Kevin Quinn, Jr., Richard Simmons, and Eric Bowser ("Defendants"), move this Court for summary judgment (the "Motion") (ECF No. 41). Defendants seek a ruling from the Court that Plaintiff Eric Whitaker cannot prevail on his retaliation claim against Defendants because he cannot demonstrate the required elements of the claim. ECF No. 41-1 at 1–2. Plaintiff filed an opposition to Defendants' Motion (ECF No. 42) and Defendants replied (ECF No. 44). After considering the Motion and responses thereto, the Court finds that no hearing is necessary. *See* Loc.R. 105.6 (D.Md. 2018). In addition, having reviewed the pleadings of record and all competent and admissible evidence submitted by the parties, the Court finds that there is insufficient evidence from which a jury could find in Plaintiff's favor on the retaliation claim. Accordingly, the Court will GRANT Defendants' Motion (ECF No. 41).

### FACTUAL BACKGROUND

This lawsuit arises out of Plaintiff's allegation of retaliation against his current employer, Maryland Transit Administration, in violation of Title VII of the Civil Rights Act of 1964. The

facts are viewed in a light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The Maryland Transit Administration ("MTA") is a state-operated agency responsible for administering mass transit throughout Maryland. ECF No. 1-2 at 1. MTA is headquartered in Baltimore, Maryland, and employs approximately 3,200 employees. *Id.* Defendant Kevin B. Quinn, Jr. is the current MTA Administrator, the chief executive of the agency. ECF No. 41-2, ¶ 3. At the time of the alleged retaliation in October 2014, Defendant Richard Simmons was the Superintendent of Bus Facilities Maintenance for MTA, *see* ECF No. 1-14, and Defendant Eric Bowser was the Superintendent of Metro Facilities Maintenance for MTA, ECF No. 41-3, ¶¶ 2–3. Mr. Bowser is currently the Manager of Metro Maintenance for MTA. ECF No. 41-3, ¶ 3. Messrs. Quinn, Simmons, and Bowser are parties only in their official capacity with MTA. ECF No. 25, ¶¶ 7–8; ECF No. 28 at 1.

Plaintiff, an African-American, has been employed with MTA since 1989 and is a member of the Amalgamated Transit Union, Local 1300 ("Local 1300"), which represents certain classes of MTA employees. ECF No. 1, ¶¶ 21–22. Plaintiff's claim of retaliation stems from a decrease in his hourly pay rate that occurred when he voluntarily transferred from his position as an "A" Repairman-Welder in the Bus Facilities Maintenance Office to an "A" Repairman-Electro-Mechanic position with no welding duties in the Metro Facilities Maintenance Office in October 2014. ECF No. 43 at 13–17. However, before addressing MTA's alleged retaliatory actions, a discussion of the collective bargaining agreement governing Plaintiff's "A" Repairman position is warranted.

## A. Collective Bargaining Agreement & "A" Repairman Job Classification

A collective bargaining agreement ("CBA") executed between Local 1300 and MTA governs certain terms of employment for Local 1300 members, including classification of employees and rate of pay. ECF No. 41-4 at 5–7, 8–11, 12–16. The CBA divides Local 1300 members into two departments: Operating and Non-Operating. ECF No. 41-3, ¶ 4. The Non-Operating Department, which provides facility and vehicle maintenance, is at issue in this case. *Id.*

Pursuant to the CBA, the Non-Operating Department is divided into groups according to function. ECF No. 41-4 at 5–7. Pertinent to this case is Group 6, the Facilities Maintenance Group. *Id.* Group 6 is divided into two separate offices: Bus Facilities Maintenance and Metro Facilities Maintenance. ECF No. 41-3, ¶ 4. Both offices employ Local 1300 members that are classified as "A" Repairmen. ECF No. 41-4 at 8–9. "A" Repairmen are a class of employees created under the CBA that perform various and unrelated functions, including bus and vehicle mechanics, electricians, plumbers, and carpenters. ECF No. 41-2, ¶ 5; ECF No. 41-3, ¶ 5. Employees within the "A" Repairman classification also have a sub-classification, such as "A" Repairman-Bus Mechanic, "A" Repairman-Plumber, or "A" Repairman-Rail. ECF No. 41-2, ¶ 5. Each "A" Repairman sub-classification requires different minimum qualifications, testing, and licensing. *Id.* However, under the CBA, employees in the "A" Repairman classification generally receive the same rate of pay. *Id.*

Because "A" Repairmen have different job qualifications and licensing requirements, Local 1300 and MTA agreed in the CBA to a concept referred to as "expert" pay, which permits some "A" Repairmen to receive and retain a higher pay rate after passing a test of expert skills administered by the MTA or obtaining certification through external testing in a particular field.

3

*Id.* ¶ 6. Local 1300 and MTA also agreed to another concept, referred to as "skilled trades" pay, in which they created special classifications of "A" Repairman that received a higher pay rate based on sub-classification. *Id.* ¶ 7. These special classifications of "A" Repairman included "A" Repairman-Plumber, "A" Repairman-Electrician, "A" Repairman-Heating, Ventilation, and Air Conditioning, and "A" Repairman-Welder. *Id.* The rationale for the "skilled trades" pay concept was that each of these sub-classifications are a skilled trade requiring either a journeyman's license or certification from an accredited facility as a minimum job qualification. *Id.*

After these concepts became effective in May 2009, disputes arose between Local 1300 and MTA regarding the higher pay rate under the "skilled trades" pay concept. *See generally* ECF No. 1-8. In November and December 2009, sixteen "A" Repairmen filed grievances claiming entitlement to "skilled trades" pay for welding. *Id.* at 7–8. The resulting arbitration award, issued on January 19, 2011, granted "skilled trades" pay to certain "A" Repairmen that had obtained their welding certification from a particular facility before the "skilled trades" pay concept became effective in May 2009. *Id.* at 25–26, 28–29. However, the arbitrator remanded the question of "skilled trades" pay for other "A" Repairmen back to the parties for further negotiation, *id.* at 29, and the parties later reached an agreement in November 2011, ECF No. 1-10. Notably, this dispute did not involve Plaintiff. *See* ECF No. 1-10 at 4.

### B. Alleged Retaliation by MTA

Plaintiff began his employment with MTA in 1989 as a Bus Mechanic. ECF No. 1, ¶ 22. In September 2001, Plaintiff submitted a bid for an open "A" Repairman-Electro-Mechanic position in the Bus Facilities Maintenance Office and was awarded the position. *Id.* ¶¶ 24, 26. This position was part of Group 6 of the Non-Operating Department pursuant to the CBA. ECF

4

No. 41-4 at 5–6, 8–9. From September 2001 to October 2014, Plaintiff worked as an "A" Repairman-Electro-Mechanic in the Bus Facilities Maintenance Office. ECF No. 1, ¶¶ 24, 65.

During Plaintiff's time in the Bus Facilities Maintenance Office, MTA recommended welding training for "A" Repairmen. *Id.* ¶ 38. Plaintiff requested to participate in training but was allegedly denied.[1] *See id.* Thereafter, Plaintiff filed a complaint with the Maryland Commission on Civil Rights and the Equal Employment Opportunity Commission in June 2012 alleging, *inter alia*, that MTA denied him the opportunity to receive the welding training. *Id.* ¶ 48; ECF No. 41-5 at 9–10. On January 10, 2013, after a hearing, Plaintiff entered into a settlement agreement with MTA in which MTA agreed that Plaintiff would be eligible for the training and Plaintiff agreed not to pursue the complaint further. ECF No. 1-6 at 2. During the fall of 2013, Plaintiff completed the welding training and received his certification on November 11, 2013. ECF No. 1-12. MTA then reclassified Plaintiff's position as an "A" Repairman-Electro-Mechanic to "A" Repairman-Welder and gave him the "skilled trades" pay rate of $28.55 in November 2013. ECF No. 41-6.

In the fall of 2014, Mr. Bowser advertised a vacancy for an "A" Repairman-Electro-Mechanic position in the Metro Facilities Maintenance Office. ECF No. 41-3, ¶ 6. Plaintiff indicated his interest in the position, ECF No. 41-7 at 1, and was then transferred into the position. ECF No. 41-3, ¶ 6. Upon transfer, Mr. Simmons, Plaintiff's supervisor in the Bus Facilities Maintenance Office, completed an AS-1 form[2] to document the transfer, but he incorrectly identified Plaintiff's position with the Bus Facilities Maintenance Office as "A" Repairman-Electro-Mechanic, rather than "A" Repairman-Welder. ECF No. 1-14. MTA's Department of

---

[1] According to Plaintiff, MTA only recommended training for Caucasian "A" Repairmen. ECF No. 1, ¶ 38.

[2] An AS-1 form is a form utilized by MTA to document all changes in employee information and employment status. ECF No. 41-2, ¶ 9.

5

Employment Services corrected this error in a second AS-1 form in November 2014 to show that Plaintiff moved from an "A" Repairman-Welder position to an "A" Repairman-Electro-Mechanic position. ECF No. 1-16. Plaintiff's voluntary transfer from the "A" Repairman-Welder position to the "A" Repairman-Electro-Mechanic position resulted in a pay decrease from the "skilled trades" pay rate of $28.55 for welding to the ordinary "A" Repairman rate of $27.63, as reflected in the corrected AS-1 form. *Id.*

Upon learning of the decrease in pay, Plaintiff filed a union grievance in December 2014, arguing that his transfer was a "lateral move within the same job classification and group" and that he was, therefore, still entitled to the increased pay rate of $28.55 awarded to "A" Repairman-Welders. ECF No. 1-17 at 1. After a hearing on January 26, 2015, the hearing officer issued a written decision on February 5, 2015 finding that Plaintiff was still entitled to the "skilled trades" pay after his transfer and ordering MTA to reinstate that pay rate as well as provide Plaintiff with backpay. ECF No. 1-18. Additionally, the hearing officer noted that "MTA may elect not to have certified welders in the Metro Facilities Maintenance [D]epartment" where there is no welding work, at which time MTA could remove the "skilled trades" pay. *Id.* In accordance with this decision, MTA paid Plaintiff for the lost "skilled trades" pay from October 2014 through March 2015. ECF No. 1-13.

Thereafter, Mr. Bowser and MTA reviewed the need for welders in the Metro Facilities Maintenance Office and determined that, because there was no welding work to be performed, the "A" Repairman-Welder classification would be discontinued. ECF No. 41-3, ¶ 8. At the time of the decision, there were two other welders in addition to Plaintiff in the Metro Facilities Maintenance Office. *Id.* Plaintiff and the two other welders were reclassified to "A" Repairmen-Electro-Mechanics after the grievance decision. *Id.* A third welder that subsequently transferred

into the Metro Facilities Maintenance Office as an "A" Repairman-Welder was also reclassified to "A" Repairman-Electro-Mechanic. *Id.*

In March 2015, Local 1300 filed a grievance on behalf of all employees that had lost the "skilled trades" pay after the "A" Repairman-Welder classification was discontinued. ECF No. 41-8. After a hearing on April 8, 2016, the hearing officer issued a written decision on April 29, 2016, finding that MTA did not violate the CBA when it removed "skilled trades" pay from employees that were not performing welding duties. ECF No. 41-9 at 1–2. The matter was submitted for arbitration, but no decision was issued. ECF No. 41-3, ¶ 9. Local 1300 and MTA subsequently reached an agreement in September 2017, which resulted in Plaintiff receiving payment for all lost wages due to his transfer and a commitment to pay him at the "skilled trades" rate so long as he maintains his welding certification and remains in Group 6. ECF No. 41-10 at 1–2.

## PROCEDURAL BACKGROUND

On January 19, 2016, Plaintiff filed a Charge of Discrimination against MTA with the Maryland Commission on Civil Rights and the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation dating from December 1, 2014 through December 1, 2015. ECF No. 1-1. In the charge, Plaintiff stated that his pay was decreased due to the prior charge he filed against MTA in 2012 and that, "with the exception of a single payment on March 13, 2015," he stopped receiving the increased pay altogether. *Id.* On November 30, 2016, the EEOC issued a Dismissal and Notice of Rights to Plaintiff, informing him that the evidence presented was insufficient to support a finding of retaliation. ECF No. 1-4 at 2.

On February 28, 2017, after exhausting his administrative remedies, *see id.* at 1–2, Plaintiff filed suit in this Court against Defendants alleging that he suffered race discrimination, retaliation,

7

hostile work environment, and unequal pay in his employment with MTA, ECF No. 1. Plaintiff also alleged intentional infliction of emotional distress based upon Defendants' actions. ECF No. 1 at 20.

On April 3, 2017, Defendants filed a pre-discovery motion to dismiss, or in the alternative, for summary judgment. ECF No. 21. On April 16, 2017, Plaintiff filed an opposition, ECF No. 22, and Defendants filed a reply on May 1, 2017, ECF No. 23. In an order dated February 14, 2018, the Honorable Ellen L. Hollander dismissed all claims and parties set forth in the Complaint except Plaintiff's Title VII claim of retaliation against MTA, Paul Comfort,[3] Richard Simmons, and Eric Bowser in their official capacities.[4] ECF No. 25, ¶ 7.

On October 29, 2018, Defendants filed their Motion seeking summary judgment against Plaintiff for his claim of retaliation in violation of Title VII of the Civil Rights Act of 1964. ECF No. 41. On November 13, 2018, Plaintiff filed an opposition, ECF No. 42, and Defendants filed a reply on November 27, 2018, ECF No. 44.

This matter is now fully briefed and the Court has reviewed Defendants' Motion as well as the responses thereto. For the foregoing reasons and pursuant to Federal Rule of Civil Procedure 56(a), Defendants' Motion (ECF No. 41) is GRANTED.

---

[3] On March 9, 2018, Paul Comfort, the former MTA Administrator, was terminated from the suit and substituted by Kevin B. Quinn, Jr., the current MTA Administrator. ECF No. 28.

[4] On April 12, 2018, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 of the United States Court for the District of Maryland and upon consent of the parties, this case was transferred to United States Magistrate Judge A. David Copperthite for all proceedings. ECF No. 31.

## DISCUSSION

### A. Standard of Review

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Supreme Court has clarified that not every factual dispute will defeat a motion for summary judgment but rather, there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphases in original)). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

The party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that

there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 249). Thus, "to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Moss v. Parks Corp.*, 985 F.2d 736, 738 (4th Cir. 1993) (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).

### B. Defendants' Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment because Plaintiff has failed to establish a *prima facie* case for his retaliation claim. Specifically, Defendants contend that Plaintiff is unable to demonstrate any direct or indirect evidence of retaliation and that, even if Plaintiff can establish a *prima facie* case of retaliation, the adverse action was not causally connected to any protected activity. ECF No. 41-1 at 13–17. Additionally, Defendants contend that there was a legitimate, non-retaliatory reason for their action. *Id.* at 17–20.

Title VII prohibits retaliation against an employee because the employee has "opposed" an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). Plaintiffs may prove retaliation through "two 'avenues of proof'": (1) direct or indirect evidence, or (2) the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d

277, 284–85 (4th Cir. 2004) (en banc)). "It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by mean of the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n.4 (4th Cir. 2005)). To prove retaliation, "plaintiffs are limited to 'traditional principles of but-for causation' and must be able to prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

1. Plaintiff Is Unable to Establish Any Direct Or Indirect Evidence Sufficient to Support A Finding Of Retaliation.

"A plaintiff seeking to use direct and indirect evidence to establish a claim of retaliation following a complaint of racial discrimination is required to present 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F.App'x 466, 469 (4th Cir. 2015) (quoting *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 577–78 (4th Cir. 2015)).

Here, Plaintiff is unable to point to any direct evidence or statements that tie the June 2012 discrimination charge he filed against MTA to the reduction in his pay that occurred in October 2014. Plaintiff contends that the errors in the AS-1 forms documenting Plaintiff's transfer to the Metro Facilities Maintenance Office are evidence of retaliation. ECF No. 1, ¶¶ 66–71; ECF No. 43 at 15–16. Specifically, Plaintiff alleges that the initial AS-1 form completed by Mr. Simmons inaccurately reported his pay rate and the revised AS-1 form was "altered" by Mr. Bowser to make it appear as if Plaintiff had transferred from a skilled position to an unskilled position to justify removing his "skilled trades" pay. ECF No. 1, ¶¶ 66–71; ECF No. 43 at 15. However, as noted, the initial AS-1 form was revised by MTA's Office of Employment Services, not Mr. Bowser, in

November 2014 to accurately reflect Plaintiff's former title as "A" Repairman-Welder and the "skilled trades" pay rate. ECF No. 1-16; *see also* ECF No. 41-6 (showing an AS-1 form dated November 14, 2013, reflecting the change in Plaintiff's position from "A" Repairman-Bus to "A" Repairman-Welder). MTA also compensated Plaintiff for his lost wages and reinstated the "skilled trades" pay rate, placing Plaintiff on equal footing with the other "A" Repairmen-Electro-Mechanics in the Metro Facilities Maintenance Office. ECF Nos. 1-13, 1-18. Furthermore, neither AS-1 form indicates that Plaintiff's 2012 discrimination charge was considered during his department transfer, ECF Nos. 1-14, 1-16, and Plaintiff has shown no evidence demonstrating that the 2012 charge affected Mr. Bowser's decision to discontinue the "A" Repairman-Welder classification in the Metro Facilities Maintenance Office. Instead, the evidence demonstrates that Plaintiff's pay decrease was a result of his voluntary transfer from the "A" Repairman-Welder position to the "A" Repairman-Electro-Mechanic position that did not have welding duties. Consequently, Plaintiff has not put forth sufficient direct or indirect evidence upon which a reasonable jury could find retaliation.

    2. Plaintiff Cannot Establish Retaliation Under The *McDonnell Douglas* Burden-Shifting Framework.

A retaliation claim may also be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006). Under that framework, if Plaintiff states a *prima facie* case of retaliation, the burden shifts to Defendants to show that they had a legitimate, non-retaliatory reason for its contested action. *See id.* at 551. If Defendant makes such a showing, the burden then shifts back to Plaintiff to show that the stated reason was pretextual and that retaliation was the "actual reason" for the contested action. *See Foster*, 787 F.3d at 253–54.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove that "(1) the plaintiff engaged in a protected activity . . . ; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). An adverse employment action is "any retaliatory act or harassment if that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment." *Ensko v. Howard Cty., Md.*, 423 F.Supp.2d 502, 509 (D.Md. 2006) (citations omitted). "[A]s to the third element, both this Court and the United States Court of Appeals for the Fourth Circuit have held that proximity in time between the protected activity and the adverse employment action may be sufficient to establish the causation requirement." *McGrath-Malott v. Maryland*, 565 F.Supp.2d 656, 671 (D.Md. 2008). Moreover, this causation requirement "requires [the plaintiff] to demonstrate not only a causal connection between his opposition and his termination, but that his opposition was the 'but for' cause of that termination." *Noel v. United Parcel Serv., Inc.*, PWG-13-1138, 2014 WL 4452667, at *8 (D.Md. Sept. 9, 2014) (citation omitted).

There is no question that Plaintiff engaged in protected activity by filing the discrimination charge with the Maryland Commission on Civil Rights and the EEOC in June 2012. Defendants also do not dispute that the decrease in pay in October 2014 is an adverse employment action for purposes of the Motion. ECF No. 41-1 at 15. Defendant challenges, however, whether based on the factual record construed in the light most favorable to Plaintiff, Plaintiff has shown a causal connection between the protected activity in June 2012 and the adverse employment action in October 2014. *Id.*

13

"[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). "Generally, however, the passage of time alone cannot provide proof of causation unless the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close.'" *Pepper v. Precision Valve Corp.*, 526 F.App'x 335, 337 (4th Cir. 2013) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). A "significant lapse of time between the protected activity . . . and [the adverse employment action] does not support an inference of retaliation." *Jones*, 629 F.App'x at 469 (finding no causal connection where there was a nine month lapse between plaintiff's complaint and his termination); *see also Clark Cty. Sch. Dist.*, 532 U.S. at 273–74 (finding no causal connection where there was a twenty month lapse between plaintiff's EEOC complaint and her transfer); *Pepper*, 526 F.App'x at 337 (finding no causal connection where there was a ten month lapse between plaintiff's filing of a lawsuit and his termination); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir. 2006) (finding no causal connection where there was a three or four month lapse between plaintiff's protected activity and his termination).

Here, as in *Pascual*, Plaintiff's only evidence of a causal connection is the temporal proximity of the protected activity and the adverse employment action. ECF No. 43 at 16. In *Pascual*, the United States Court of Appeals for the Fourth Circuit found that the three to four month time period between the plaintiff's complaints of harassment and his termination was "too long to establish a causal connection by temporal proximity alone." 193 F.App'x at 233. The nearly twenty-eight month lapse between Plaintiff's June 2012 discrimination charge and the

14

October 2014 decrease in pay far exceeds that in *Pascual* and does not support an inference of causality.

Further, Plaintiff has presented no evidence demonstrating that Mr. Bowser was even aware of the June 2012 discrimination charge when he made the decision to discontinue the "A" Repairman-Welder classification in the Metro Facilities Maintenance Office or that he expressed animus towards Plaintiff for the charge. "To establish a causal link between the alleged animus and the adverse employment action, a plaintiff must demonstrate that the individuals who expressed animus played a role in the adverse employment action." *Jones*, 629 F.App'x at 470 (finding no causal connection where the individuals responsible for plaintiff's termination had not been the subjects of plaintiff's complaints and had expressed no animus towards plaintiff). Here, the 2012 discrimination charge alleged harassment by individuals within the Bus Facilities Maintenance Office but did not implicate Mr. Bowser. ECF No. 1, ¶¶ 44–48. Rather, Plaintiff conceded that he has known Mr. Bowser for twenty-five years and that they have had a good working relationship. ECF No. 41-5 at 11–12. Accordingly, where Plaintiff has not established any causal connection by temporal proximity or evidence of Mr. Bowser's animus, he has not presented sufficient evidence to satisfy the third element of the *McDonnell Douglas* framework and cannot make a *prima facie* case of retaliation.

Assuming *arguendo* that Plaintiff has established a *prima facie* case of retaliation, the burden shifts to Defendants to show that they had a legitimate, non-retaliatory reason for terminating Plaintiff. This is a burden of production, not persuasion, meaning that Defendants merely have to provide evidence demonstrating that the decrease in pay was not in retaliation for Plaintiff's discrimination charge. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Defendants easily carry this burden because they produced evidence showing that

15

Plaintiff's pay decrease resulted from a lack of welding work available in the Metro Maintenance Facilities Office, which prompted management's decision to discontinue the welding classification and the "skilled trades" pay. ECF No. 41-3, ¶ 8.

Because Defendants have carried the burden of producing evidence of a legitimate, non-retaliatory reason, the burden shifts to Plaintiff to show that Defendants' explanation is pretextual. To show pretext, Plaintiff must demonstrate that were it not for Defendants' desire to retaliate against him for his protected activity, his pay would not have been decreased. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (holding that Title VII claims of retaliation require a showing of "but-for causation," meaning a plaintiff must provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"). To do so, Plaintiff must present evidence that (1) Defendants' reason for the decrease in pay was false; and (2) retaliation for his protected activity was the real reason for Defendants' action. *See Foster*, 787 F.3d at 252. As a practical matter, the burden to show pretext "merge[s] with the ultimate burden of persuading the court" that the plaintiff has been the victim of unlawful retaliation, which Plaintiff can accomplish by showing that Defendants' proffered explanation is "unworthy of credence." *Holland*, 487 F.3d at 214 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Here, Plaintiff has put forth no evidence showing that Defendants' proffered legitimate explanation was false. He does not contest that, pursuant to the hearing officer's grievance decision dated February 5, 2015, Defendants had the authority to discontinue the welding classification where there was no welding work to be performed, ECF No. 1-18, or that other employees classified as "A" Repairmen-Electro-Mechanics also lost their "skilled trades" pay as a result of the reclassification, ECF No. 41-3, ¶ 8. Although Defendants reclassified Plaintiff's

16

position, it is worth noting that they compensated him for his lost "skilled trades" pay in March 2015. ECF No. 1-13. Defendants also entered into a settlement agreement in September 2017 in which they agreed to provide Plaintiff with backpay and committed to paying Plaintiff at the "skilled trades" rate for as long as he maintained his welding certification and remained in Group 6. ECF No. 41-10 at 2, 4. Based on the evidence in the record, no reasonable jury could conclude that Defendants' proffered explanation is "unworthy of credence." *Burdine*, 450 U.S. at 256.

Therefore, because Defendant has put forth evidence of a legitimate, non-retaliatory basis for decreasing Plaintiff's pay rate and Plaintiff has failed to present any evidence sufficient to refute it or otherwise establish a genuine issue of material fact on causation, Defendants are entitled to judgment as a matter of law on the claim of retaliation.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that, in the light most favorable to Plaintiff, there is insufficient evidence from which a jury could find in Plaintiff's favor on his retaliation claim. Therefore, Defendants' Motion (ECF No. 41) is GRANTED. A separate order will follow.

Date: 7 December 2018

A. David Copperthite
United States Magistrate Judge